**In re The Application of Luis Alejandro RODRIGUEZ, Petitioner,**

v.

**Marisabel Ramos Valery RODRIGUEZ, Respondent.**

**No. Civ.A. WMN–98–3946.**

United States District Court,
D. Maryland.

Jan. 26, 1999.

---

12.  *See* text accompanying n. 7, *supra*.

Stephen John Cullen, Miles & Stockbridge, Baltimore, Maryland, for petitioner.

Marguerite Angelari, Family Law Clinic, University of Baltimore School of Law of Baltimore, Baltimore, MD, for respondent.

## *MEMORANDUM*

NICKERSON, District Judge.

Petitioner Luis Alejandro Rodriguez brings this action under the provisions of the Hague Convention on the Civil Aspects of International Child Abduction [1] and the International Child Abduction Remedies Act.[2] Petitioner seeks the return to Venezuela of his three minor children. Respondent Marisabel Ramos Valery Rodriguez, Petitioner's wife and the mother of the three children, opposes their return.

## *I.  FACTUAL  AND  PROCEDURAL BACKGROUND*

Petitioner was married to Respondent on May 2, 1986. Their son, Jorge, was born on September 14, 1986; their first daughter, Alejandra, was born on July 8, 1992; and their second daughter, Marisabel, was born on February 14, 1998. Immediately prior to the time that Respondent brought the children to the United States, Petitioner, Respondent, and the three children resided in Respondent's childhood home with her father.

On the morning of May 29, 1998, Respondent picked up Jorge and Alejandra at their respective schools and, with Marisabel and Respondent's sister, traveled to the United States.[3] Since arriving in the United States, Respondent and the children have resided

---

**1.**  1343 U.N.T.S. 49, 91–2 C.T.I.A. 1231 (Hague 1980).

**2.**  42 U.S.C. § 11601 *et seq.*

**3.**  Prior to that date, Respondent had obtained travel visas for herself and her three children without Petitioner's knowledge.

for the majority of the time with Respondent's mother in Germantown, Maryland. The oldest two children have been enrolled in and are attending public schools in Maryland.

Petitioner filed this action on December 2, 1998. On that same date, the Court issued an order prohibiting the removal of the children from this jurisdiction and issuing a Warrant in Lieu of Writ of Habeas Corpus as to Respondent. In response to the Warrant, Respondent appeared before this Court, without counsel, on December 4, 1998 and surrendered her and the children's travel documents. A hearing on the merits of the Petition was scheduled for December 18, 1998. After Respondent obtained counsel, the Court continued the hearing date to January 4, 1999 to provide Respondent's counsel the opportunity to file a written response to the Petition and to prepare for the hearing.

On January 4, 1999, after opening argument, the Court heard testimony from Petitioner and from Michael Marco Benaloza, an attorney proffered as an expert in Venezuelan family law. The Court then adjourned to Chambers to allow counsel and the Court to ask questions of Jorge, the oldest child. This interview with Jorge took place on the record, but out of the presence of both parents.

The hearing continued on January 13, 1999, the earliest date upon which both counsel were available. On that date, the Court heard testimony from Respondent, Respondent's sister, Respondent's mother, and finally, Dr. Katherine Killene, a licensed psychologist. After closing arguments, the Court indicated that it would hold the matter sub curia.

## II. HAGUE CONVENTION ON THE CIVIL ASPECTS OF INTERNATIONAL CHILD ABDUCTION

The Hague Convention establishes legal rights and procedures for the prompt return of children who have been wrongfully removed or retained, as well as for securing the exercise of visitation rights. Children who are wrongfully removed or retained within the meaning of the Convention are to be promptly returned unless one of the narrow exceptions set forth in the Convention applies.

The Convention provides a sound treaty framework to help resolve the problem of international abduction and retention of children and will deter such wrongful removals and retentions.

42 U.S.C. § 11601(a)(4). In 1988, Congress enacted the International Child Abduction Remedies Act ["ICARA"] to "establish procedures for the implementation of the [Hague] Convention in the United States." *Id.* at § 11601(b)(1). This Act is codified at 42 U.S.C. §§ 11601 – 11610.

█ Under the Hague Convention, courts are vested with the authority to determine whether a child has been wrongfully removed from his or her habitual residence and, if so, to order the return of the child to the Petitioner and the habitual residence. In determining whether a child should be returned, the court is not determining the custody rights of the parents. Instead, this determination will be made by the proper court or authorities of the country where the child habitually resides.

Under ICARA, the Petitioner bears the initial burden of proving by a preponderance of the evidence "that the child has been wrongfully removed or retained within the meaning of the Convention." 42 U.S.C. § 11603(e)(1)(A). Article 3 of the Hague Convention states that

[t]he removal or the retention of a child is to be considered wrongful where—

(a) it is in breach of rights of custody attributed to a person, an institution, or other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and

(b) at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

The rights of custody mentioned in subparagraph a above may arise in particular by operation of law or by reason of a judicial or administrative decision, or by reason of an agreement having legal effect under the law of the State.

Hague International Child Abduction Convention; Text and Legal Analysis, 51 Fed. Reg. 10,498 (1986). In other words, a wrongful removal in this case has occurred if Respondent brought the child to the United States in violation of Petitioner's custody rights as defined by Venezuelan law.

Once the Petitioner has satisfied this burden, the children must be returned to Venezuela unless the Respondent can demonstrate,

(A) by clear and convincing evidence that one of the exceptions set forth in Article 13b or 20 of the Convention applies; [or]

(B) by a preponderance of the evidence that any other exception set forth in article 12 or 13 of the Convention applies.

42 U.S.C. § 11603(e)(2)(A) & (B). The exceptions set forth in Articles 13b and 20 that Respondent must establish by clear and convincing evidence are:

(13b) there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation.

(20) The return of the child ... may be refused if this would not be permitted by the fundamental principles of the requested State relating to its protection of human rights and fundamental freedoms.

The exceptions set forth in Articles 12 and 13 that must be established by a preponderance of the evidence are:

(12) Where the judicial or administrative authority in the requested State has reason to believe that the child has been taken to another State, it may stay the proceedings or dismiss the application for return of the child.

(13a) the person, institution, or other body having the care of the person of the child was not actually exercising the custody rights at the time of removal or retention, or had consented to or acquiesced in the removal or retention.

(13) The judicial or administrative authority may also refuse to order the return of the child if it finds that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views.

These exceptions are to be narrowly interpreted. As the Sixth Circuit has cautioned,

[the exceptions] are not a basis for avoiding return of a child merely because an American court believes it can better or more quickly resolve a dispute. In fact, a federal court retains, and should use when appropriate, the discretion to return a child, despite the existence of a defense, if return would further the aims of the Convention.

*Friedrich v. Friedrich,* 78 F.3d 1060, 1069 (6th Cir.1996).

## III. DISCUSSION

The Court has already held, for reasons stated on the record at the close of Petitioner's case, that the children had been wrongfully removed from Venezuela. The Court is left with the determination as to whether any of the narrow exceptions of the Convention apply in this instance. Based upon evidence of a history of Petitioner's physical and psychological abuse of his son Jorge and the Respondent, Respondent argues that return of any of the children to Venezuela would expose them to a grave risk of physical or psychological harm or otherwise place the children in an intolerable situation. Respondent also argues that Jorge's expressed desire not to live with his father is an additional basis for denial of the petition. After carefully considering all of the evidence presented, the Court concludes, for the reasons discussed herein, that Respondent has met the substantial burden of proof necessary to warrant denial of the petition.

Jorge testified that his father first began to hit him when he was six years old. This first described beating occurred after Jorge had been told three times to leave a friend's house where he was playing. Upon returning home, Petitioner struck Jorge with a one inch belt about the legs, back and buttocks. The force of the blows, and resulting welts and bruises, were such that Jorge was caused to miss a week of school.

Jorge testified about another incident when he was in third grade and lost a watch that his father had given him as a "trophy"

for graduation. When his father discovered that the watch was missing, his father kicked him at least twice in the back and hit him with his fists while they were leaving the school building. His father also told him at the time that, if he had given him bruises, Jorge must not tell anyone.

Jorge testified that, in addition to physically assaulting him about twice a month, his father routinely demeaned him and called him by "bad words" on a daily basis.

Jorge told the Court that his father frequently hit his mother. He recounted that his father would choke his mother, and on one occasion, pushed her down the stairs when she was pregnant. Jorge also testified to the fear that he experienced during the physical altercations between his parents, which was exacerbated by the explosive nature of his father's temper and the inability to anticipate the extent to which it would be manifested.

Jorge presented himself as uniquely mature and articulate for his age and experience. He was also surprisingly forthright and objective in his responses. It did not appear that Jorge's judgment was clouded by access to a perceptibly more enjoyable lifestyle in the United States. Nor was there any indicia that he had been coached as to what to say. Despite his fear of his father, Jorge also freely expressed his affection. "He is my father, I have to love him, but he does bad things."

Respondent's testimony corroborated much of Jorge's. She described finding Jorge after the first beating "naked, with blows all over his body from his head to his toes." Although she made a report to the police after this incident, she withdrew it after Respondent apologized and promised it would never happen again. Nonetheless, Petitioner continued to abuse Jorge "many times," punching him with his fists, kicking him, hitting him with a belt, and scratching his face.

Respondent also testified as to Petitioner's psychological abuse of Jorge. Petitioner would frequently belittle Jorge with debasing names. He also demeaned Respondent by telling Jorge that his mother slept with other men and that she had killed Jorge's brother.[4]

Officials at Jorge's school had learned of some of the incidents of physical abuse and, in fact, a teacher had observed Petitioner kicking Jorge during the watch incident. Petitioner was asked to come to the school on at least one occasion to speak to the school psychologist about the abuse of Jorge.

Respondent also described her own abuse at the hands of her husband. She testified that Petitioner would hit her once or twice a month for as long as they have been together. He would choke her, put a pillow over her face and hold it there until she became "desperate," strike her with a closed fist, and "stomp" on her. He once cut her lip with a cup, leaving a scar, and on another occasion, broke her nose.

Respondent also recounted that both her husband and her father kept loaded handguns in the house and would frequently display them after they had been drinking. On one occasion, the two men argued and fired the guns at one another while inside the house. Her husband would become drunk about twice a week. Respondent once found a packet of white powder in the pocket of Petitioner's clothing which Petitioner told her was cocaine.

According to Respondent, the middle child, Alejandra, observed the physical abuse of both Jorge and Respondent. Although Petitioner never hit Alejandra, she was always afraid of misbehaving because she saw what happened to her brother.

The testimony of Respondent's sister and mother is consistent in the portrayal of Petitioner. Respondent's mother describes arriving at the Petitioner's and Respondent's home and finding Respondent on the floor crying and saying, "he is hitting me again." After this particular incident, Respondent and her mother went to 3 or 4 different police stations to seek help, only to be told that the police would not become involved in

---

4. This latter accusation is a reference to the abortion of the couple's first child just prior to their marriage.

a domestic dispute. Respondent's sister testified, inter alia, that because of her assistance in Respondent's flight from Venezuela, Petitioner has telephoned her and threatened to kill her, "I will find you and I will kill you—don't forget you have a daughter." [5]

Finally, Dr. Killene testified, describing her interviews with Respondent, Jorge, and Alejandra, and presenting her conclusion as to the impact that returning to Venezuela would have on the children. Based on her expertise as a psychologist with considerable experience in abuse cases, Dr. Killene concluded, without reservation, that the return of the children to Venezuela would expose them to a grave risk of psychological and/or physical harm and would subject them to an intolerable situation.

Dr. Killene opined that both Jorge and Alejandra, as well as their mother, suffer from Post Traumatic Stress Disorder ["PTSD"] as a result of Petitioner's conduct. PTSD, she explained, is a psychiatric illness which develops following exposure to a particularly traumatic event, either as a victim or a witness. Dr. Killene reported that, while in Venezuela, Jorge would experience stomach aches and sleep disorders because he did not know when to expect the next upheaval. Alejandra, while not directly physically abused herself, witnessed the abuse of both her mother and her brother. Dr. Killene explained that witnessing the abuse of another can be more emotionally traumatic than being the abused. Dr. Killene described Alejandra as having been exposed to "enormous and insidious" trauma. When her brother or mother would be hit, Alejandra would "cover her ears and eyes so she wouldn't have to cry as much."

Both children reported having bad dreams which Dr. Killene believes are related to their stress disorder. Alejandra reports having dreams that her mother is killed. Dr.

Killene concludes that the children's only hope of recovery from PTSD is to be placed in a secure and safe environment. Returning the children to Venezuela, even if it did not result in the children's physical abuse at the hands of their father, would result in psychological trauma because of the children's fear of physical harm, a fear well grounded in their experience.

There is nothing in the record to contradict Dr. Killene's diagnosis or opinion. Petitioner presented no expert witness of his own. Furthermore, his own testimony served, perhaps more than any of the testimony given in the proceedings, to heighten the Court's concern for the safety of the children should they be returned to Venezuela.

Throughout his testimony, Petitioner was evasive, argumentative, and, at times, self-contradictory. Petitioner unequivocally denied ever having hit Jorge, or even having used corporal punishment on Jorge. Given the other testimony in this proceeding, the Court finds Petitioner's testimony to lack credibility.

Petitioner also denied that the psychologist at Jorge's school ever spoke to him about physically abusing Jorge and, at the same time, expressed utter contempt for the entire profession of psychology. Through his demeanor in the courtroom, Petitioner appeared to express this same distrust and contempt for psychologists as Dr. Killene described the emotional trauma experienced by his children.

Petitioner's deportment in the courtroom and his complete denial of any culpability in this matter leaves little doubt that he would make no effort to alter the destructive manner in which he interacts with his family. In fact, given his visible antagonism to the testimony given in this proceeding and apparent disdain toward the concept of psychological

---

**5.** Respondent's sister also offered two documents that she recently received from Venezuela. One was a report from the psychologist at Jorge's school, Dr. Philipe, detailing the incident over the lost watch and Dr. Philipe's meeting with Petitioner thereafter. The other document was an affidavit from a 1991 court proceeding in which Respondent sought permission to travel with Jorge outside of Venezuela. The affiant appears to have been a neighbor of Respondent who testified as to the abuse of Jorge. These documents corroborate the testimony of Respondent and Jorge. There are sufficient evidentiary concerns about these documents, however, that the Court will give them no weight. The Court finds Jorge's and Respondent's testimony sufficiently trustworthy that no additional corroboration is required.

harm, it would appear that the risk to his wife and children has increased exponentially as a result of these proceedings.

The Court notes that, while the exceptions to the Convention are to be construed narrowly, the instant case is closely analogous to one of the types of situations that the United States Department of State identified as clearly within the "grave risk/intolerable situation" exception:

> An example of an "intolerable situation" is one in which a custodial parent sexually abuses the child. If the other parent removes or retains the child to safeguard it against further victimization, and the abusive parent then petitions for the child's return under the Convention, the court may deny the petition. Such action would protect the child from being returned to an "intolerable situation" and subjected to a grave risk of psychological harm.

*Friedrich,* 78 F.3d at 1069 (quoting Public Notice 957, 51 FR 10494, 10510 (March 26, 1986)). While the State Department's illustration refers to sexual abuse of the child, and not physical abuse as we have here, the Court sees no reason to conclude that being physically abused with the frequency and severity as that experienced by Jorge is any more tolerable. *See In re Blondin v. Dubois,* 19 F.Supp.2d 123 (S.D.N.Y.1998) (finding "grave risk" and denying petition for return under circumstances very similar to those in this action).[6]

For the reasons stated, the Court finds that Respondent has shown by clear and convincing evidence that returning the children to Venezuela would expose them to both physical and psychological harm and would place them in an intolerable situation.[7]

Accordingly, the petition for the return of the children will be denied.

---

6. Although the Court need not reach the issue, the Court also finds that Jorge's expressed desire to remain in the United States would be sufficient grounds to deny the Petition, at least as to Jorge, under the exception in section 13.

7. Little evidence was submitted by either side as to the youngest child, Marisabel. Marisabel was just three months old at the time she was brought to the United States. She is only eleven months old at this time. In response to a question from the Court, however, Petitioner's counsel conceded that any splitting up of the family would be emotionally detrimental for all of the children. This would be particularly true for Marisabel. Therefore, given that the Court finds that Jorge and Alejandra cannot be returned to Venezuela without exposing them to a grave risk of harm, the Court will deny the petition as to Marisabel as well.