251 S.W.3d 117 (2008)
In the Interest of A.V.P.G. and C.C.P.G., Minor Children.
No. 13-07-0050-CV.
Court of Appeals of Texas, Corpus Christi-Edinburg.
February 14, 2008.
Rehearing Overruled April 30, 2008.
*120 Lucia Thompson-Perez, David N. Calvillo, Lorraine Orozco, Law Office of Lucia Thompson-Perez, McAllen, for appellants.
Ernest Aliseda, McAllen, for appellee.
Before Chief Justice VALDEZ and Justices GARZA and VELA.

OPINION
Opinion by Justice VELA.
Frederic Piret ("Piret") appeals from the denial of his motion requesting the court to return his children to him in Belgium. He urges relief pursuant to the Hague Convention on the Civil Aspects of International Child Abduction ("Hague Convention") and its implementing legislation, the International Child Abduction Remedies Act ("ICARA"). 42 U.S.C.A. §§ 11601-11610 (1988). Piret complains of three specific trial court findings: (1) that he filed his petition more than one year after his children were wrongfully removed, allowing the court to consider whether the children were "well-settled" in their new environment; (2) that the children were in fact "well settled" in their new environment; and (3) that there was a risk of potential psychological and/or physical harm if the children were to return to Belgium. We reverse the trial court's judgment and order that the children be returned to Belgium.

I.

Background
Piret is a citizen of Belgium. His wife, Georgina Guajardo Gonzalez ("Guajardo") is a citizen of Mexico and Belgium. Piret and Guajardo were married in 2000, in Monterrey, Mexico. Several days after they were married, they moved to Belgium *121 and bought an apartment. In November 2001, the couple's first child, C.C., was born in Belgium. In October 2002, the couple moved back to Mexico with the understanding that Piret would try to find employment in his field. In May 2003, the couple's second child, A.V., was born in Monterrey, Mexico.
Piret moved back to Belgium in January 2004, because he could not find employment in Mexico. Guajardo was supposed to join him in February 2004, but she was under pressure from her family to stay in Mexico. In June 2004, Guajardo and the children returned to Belgium, and the couple and their children lived together as a family. During this time, the older child was enrolled in a Belgian school, and the younger child stayed at home with Guajardo while Piret worked.
In September 2005, Guajardo's parents arrived in Belgium, presumably to visit. On September 12th, Guajardo called Piret at his office to tell him that she and her parents were going to visit the north of Belgium and would be taking the children with them. Piret agreed and asked Guajardo to call him regularly.
On the evening of September 12th, Piret made several unsuccessful telephone attempts to contact Guajardo. On the 13th, he made repeated attempts to reach Guajardo, again to no avail. Piret later learned that Guajardo had obtained duplicate passports for the children from the Mexican Consulate in Belgium, representing that the originals had been lost. He further learned that Guajardo, her parents, and the children had flown to Mexico.
On that same day, Piret contacted the Belgian police and reported the abduction. In early October 2005, Piret went to a Belgian court seeking custody of his children. On October 27th, Piret received a Belgian court order granting him "exclusive parental authority" over the children. On February 27, 2006, an international arrest warrant was issued for Guajardo for kidnapping the children.
On August 27, 2006, Guajardo, her parents, and the children attempted to cross the Texas-Mexico border, ostensibly to go shopping in McAllen, Texas. United States Border Patrol agents arrested and detained Guajardo based on the international warrant. Protective Services assumed custody of the children and placed them in foster care. Piret received notice from Belgian authorities in late August 2006, that Guajardo had been arrested in the United States.
On August 29, 2006, Guajardo's parents filed a petition for possession of the children and a request for ex-parte temporary orders in a Hidalgo County court. Piret filed a request for return of the children on August 31, 2006, in Belgium, whereby he asserted that the children's residence was Belgium. On September 7, 2006, Protective Services, as temporary managing conservators of the children, filed a "Notice of Pending Application for Return of A Child Under the Hague Convention and the Civil Aspects of International Child Abduction," notifying the court that an application for return of the children to Belgium had been filed with the United States Department of State pursuant to the Hague Convention. Protective Services's pleading reflected that a complaint against Guajardo had been filed in the federal court in McAllen on August 28, 2006. The pleading, filed by Protective Services in the county where the children were residing, specifically asked the court not to make any decision regarding custody or possession until there has been a ruling on the Hague Convention petition. On September 8, 2006, the trial court granted Guajardo's parents' request for temporary custody of the children, but ordered the children to remain in Hidalgo *122 County. Guajardo's parents moved to Hidalgo County, and enrolled the children in a McAllen school. On October 1, 2006, Piret filed another request for return of the children in the state district court in Hidalgo County.
The Hidalgo County court conducted a final hearing on December 21, 2006, ultimately denying Piret's request to return the children to him. Specifically, the court found:
that the children were "well-settled" as defined under the Hague Convention on the Civil Aspects of International Child Abduction. The Court further finds that there is a risk of potential psychological and/or physical harm under Article 13(b) of the Convention, if the children were to be ordered returned to Belgium.
Piret appeals.

II.

The Hague Convention and ICARA
A. Purpose
We begin our analysis with the plain language and purpose of the Hague Convention. In 1980, various nations, including the United States, agreed to the Hague Convention in order to "protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence." Antunez-Fernandes v. Connors-Fernandes, 259 F.Supp.2d 800, 809 (N.D.Iowa 2003); Hague Convention, Preamble, 51 Fed.Reg. 10,494 (1986); see Croll v. Croll, 229 F.3d 133, 137 (2d Cir. 2000); Koc v. Koc, 181 F.Supp.2d 136, 145 (E.D.N.Y.2001). Both the United States and Belgium are signatories to the Treaty. Hague Convention, arts. 3, 12, reprinted at 51 Fed.Reg. 10,498-99. The Hague Convention has several purposes, including: 1) to preserve the pre-abduction status quo custody arrangements of the parties, and 2) to deter a parent from crossing international boundaries in search of a more sympathetic court. Lops v. Lops, 140 F.3d 927, 936 (11th Cir.1998); Friedrich v. Friedrich, 78 F.3d 1060, 1064 (6th Cir. 1996). Under the Convention, the court has the authority to determine the merits of an abduction claim, but not the merits of the underlying custody claim. Blondin v. Dubois, 189 F.3d 240, 245 (2d Cir.1999)(citing Friedrich v. Friedrich, 983 F.2d 1396, 1400 (6th Cir.1993)); accord Wojcik v. Wojcik, 959 F.Supp. 413, 416-17 (E.D.Mich. 1997). The Convention is premised on the principle that the country where the child is a habitual resident is in the best position "to decide upon questions of custody and access." Croll, 229 F.3d at 137.
In 1988, the United States Congress implemented the Hague Convention by enacting the International Child Abduction Remedies Act, 42 U.S.C.A. §§ 11601-11610 (1988). See Croll, 229 F.3d at 134; Wojcik, 959 F.Supp. at 417. Under the ICARA, the "courts of the States and United States district courts shall have concurrent original jurisdiction of actions arising under the Convention." 42 U.S.C.A. § 11603(a); see Koc v. Koc, 181 F.Supp.2d at 146; see also In re Lewin, 149 S.W.3d 727, 731 n. 6 (Tex.App.-Austin 2004, no pet.).
B. Burden on the Party Seeking Return/Repatriation
The ICARA establishes specific burdens of proof for the parent seeking return under the Convention, and for the parent who opposes the child's return. Koc, 181 F.Supp.2d at 146. Any person seeking to initiate judicial proceedings can do so by filing a petition in any court which has jurisdiction of such action and which is authorized to exercise its jurisdiction *123 in the place where the child is located at the time the petition is filed. 42 U.S.C.A. § 11603(b). Article 12 of the Convention provides that the authority concerned shall order the return of the children if proceedings before a judicial or administrative body have commenced less than one year from the date of the wrongful removal or retention. Hague Convention, art. 12 (emphasis added).
The petitioner seeking to have a child returned must first establish "by a preponderance of the evidence . . . that the child has been wrongfully removed or retained within the meaning of the Convention." 42 U.S.C.A. § 11603(e)(1)(A). The removal of a child from the country of its habitual residence is wrongful under the Hague Convention if a person in that country is, or otherwise would be, exercising custody rights to the child under that country's law at the moment of removal. In order to show that the removal or retention was wrongful, the petitioner must establish that the removal or retention:
1) is in breach of the rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and
2) at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.
Hague Convention, art. 3; see Croll, 229 F.3d at 137; Koc, 181 F.Supp.2d at 146.
Once a petitioner has established that the retention or removal was wrongful and in violation of the petitioner's custodial rights, "the court must order the child's return to the country of habitual residence unless the respondent demonstrates that one of the [Hague Convention's] four narrow exceptions apply." Croll, 229 F.3d at 138; see 42 U.S.C.A. § 11601(a)(4). Guajardo does not contest that Piret was exercising his "rights of custody" in Belgium; nor does she contest that Belgium was the country of the children's habitual residence. Further, she does not contend that the children were removed "wrongfully." Because Piret has shown that he was exercising his custody rights and Belgium was the country of the habitual residence of the children, Guajardo must show, by the proper quantum of proof, that one of the narrow exceptions apply.
C. Exceptions and Varying Burdens on Party Seeking Retention
The children must be returned unless Guajardo can prove one of the narrow exceptions to the Hague Convention apply. The degree of proof required to establish an exception varies with the defense. Certain defenses must be established by a preponderance of the evidence, including:
1) the person having care of the child was not actually exercising the custody rights at the time of removal or retention; or
2) the person having care of the child has acquiesced in the removal or retention of the child, or
3) the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views, or
4) the proceeding was commenced more than one year after the removal of the child and the child has become "well-settled" in his or her new environment; or
5) the person seeking return has consented or subsequently acquiesced in the removal or retention.
Hague Convention arts. 12, 13; see Friedrich, 78 F.3d at 1067. Other defenses must be shown by clear and convincing *124 evidence. 42 U.S.C.A. § 11603(e)(2)(A). For instance:
1) that there is a grave risk that the return of the child(ren) would expose it (them) to physical or psychological harm, or
2) that the return of the children would not be permitted by fundamental principles of the requested state relating to the protection of human rights and fundamental freedoms.
Hague Convention, Articles 13b, 20; Friedrich, 78 F.3d at 1067. All of these exceptions are narrow and are not reasons for avoiding return of a child merely because the American court believes it can quickly resolve a dispute. See 42 U.S.C.A. § 11601(a)(4). In fact, a court retains and should use its discretion to return a child when appropriate, despite the existence of a defense, if return would further the aims of the Hague Convention. Friedrich, 78 F.3d at 1067.
At trial, Guajardo urged three defenses:
1) that the proceedings seeking return of the children commenced more than one year after the children were wrongfully removed; and that the children were well-settled in their new environment;
2) that Piret acquiesced in their removal, and
3) that there was a "grave risk" of psychological or physical harm if the children were returned to Belgium.

III.

Analysis
A. The proceedings for return commenced within one year.
By his first issue, Piret argues that the trial court erred in finding that more than one year had elapsed before he commenced proceedings for his children's return, thereby allowing the court to consider whether the children were well-settled in their new environment. We agree. Although not specifically mentioned in the order, the trial court must have made the determination that Piret did not commence proceedings within one year in order to go further to find that the children were well-settled. The Convention requires that if proceedings seeking return of the children are commenced within one year from the date of abduction, the court "shall" order the return of the child. See Hague Convention, art. 12; see also Lops, 140 F.3d at 945 n. 25. If the proceedings are commenced after the expiration of one year from the date the child was abducted, the court can still order the return of the child, but can consider whether the child is now "well-settled" in his new environment. See Mendez Lynch v. Mendez Lynch, 220 F.Supp.2d 1347, 1362 (M.D.Fla.2002).
Piret testified that the children were abducted September 12, 2005. On the very next day, he contacted the Belgian police and reported their abduction. In early October 2005, Piret received a Belgian court order granting him custody of the children. He took affirmative steps to secure an international kidnapping arrest warrant on Guajardo. Once he was notified that Guajardo and the children had been detained in Texas, he filed a request for return of the children, which was received by the National Center for Missing and Exploited Children ("NCMEC") on September 6, 2006. By agreement between the NCMEC and the U.S. Central Authority, applications under the Hague Convention seeking return of the children abducted in the United States are processed by the NCMEC. His petition for return was filed on August 31, 2006, within one year of the abduction. By its petition, Protective Services also notified the court of Piret's actions on September 7, 2006. *125 Although Piret did not actually file his request for return with the Texas district court until October 1, 2006, (only two weeks after the one-year period had expired), NCMEC received his request for return on September 6, 2006, within one year of the abduction. Regardless, the Department of Protective Services, which had legal custody of the children, filed a proceeding in the Hidalgo County court to notify the court of the pending application for return of the children on September 7, 2006, which was also within a year of the abduction.
We believe Piret's conduct is consistent with the requirements of the Hague Convention. Piret took immediate action in his own country upon learning where the children were; the Belgian consulate corresponded with Protective Services about the matter, and on September 7, 2006, within the one year period, Protective Services notified the trial court that Piret had formally petitioned for the return of the children. Moreover, Piret filed a request for return of the children which was received by NCMEC on September 6, 2006. NCMEC is the organization charged by statute to accept such applications. As such, NCMEC is an administrative body under the Hague Convention.[1] This conduct established that proceedings took place within one year of the abduction of the children, and, as such, Guajardo failed in establishing this defense and the trial court should not have reached or made a finding regarding whether the children were "well-settled." Issue one is sustained.
B. Guajardo did not prove that the children were well-settled.
Piret alternatively alleges, by his second point, that Guajardo failed to demonstrate that the children are well-settled by a preponderance of the evidence. We agree.
In determining whether children are "well-settled", courts view a variety of factors including: 1) the age of the children; 2) the stability of the children's new residence; 3) whether the children attend school or daycare consistently; 4) whether the children attend church regularly; 5) the stability of the mother's employment, and 6) whether the children have friends and relatives in the new area. In re Ahumada Cabrera, 323 F.Supp.2d 1303, 1314 (S.D.Fla.2004); Bocquet v. Ouzid, 225 F.Supp.2d 1337, 1349 (S.D.Fla.2002).
At the time of the hearing, the children were six and three. They were enrolled in Covenent Christian Academy in McAllen, Texas, and resided with their maternal grandparents. Their teacher at the Academy testified that the children were emotional: the older daughter did not want to go to school and cried and had tantrums when her grandmother tried to drop her off at school. She further testified that the younger boy was very aggressive, and that the school had to place them in the same classroom because they were so emotional and could not be apart. Further, the evidence showed that Guajardo's employment was neither consistent nor stable. Piret testified that while in Belgium she did not work. Guajardo testified that *126 she had recently opened a pinata shop, and prior to that, she worked at a gas station.
The children were living in Belgium with both parents when they were suddenly uprooted, resided for a time with Guajardo's parents in Mexico, then relocated to a different home in Mexico with Guajardo; were placed in foster care in Texas; and then resided with their grandparents in Texas. This transient nature of the children's accommodations can hardly be interpreted as that of being well-settled. See In re Ahumada Cabrera, 323 F.Supp.2d at 1314. The constant moving also contradicts the primary reason behind this particular exception: that after one year, the child is now well-settled. Id.; see Mendez Lynch, 220 F.Supp.2d at 1363. A removing parent must not be allowed to abduct a child and then, when brought back to court, complain that the child has grown used to the surroundings to which they were abducted. See Friedrich, 78 F.3d at 1068. The children resided in five different homes within a one year time period; this is not a well settled environment. A court should also look at whether the abducting parent could be prosecuted for the abduction when looking at whether the children are well-settled. Lops, 140 F.3d at 946. Here, Guajardo was arrested under an international arrest warrant for kidnapping. Her own conduct subjected her to criminal prosecution. Her subsequent arrest added to the instability and unrest suffered by her children when they were uprooted, placed in foster care, and went on to maintain a different residence with their maternal grandparents in Mission, Texas. Because the exceptions to the Hague Convention doctrine are to be narrowly construed, Guajardo has failed to establish this defense by a preponderance of the evidence. Blondin, 189 F.3d at 246; 42 U.S.C.A. § 11601(a)(4). Issue two is sustained.
C. Guajardo did not establish the defense of acquiescence by a preponderance of the evidence
Guajardo asserts that Piret acquiesced in her decision to have the children leave Belgium. See Antunez-Fernandes, 259 F.Supp.2d at 812; Friedrich, 78 F.3d at 1067 (citing Hague Convention art. 13(a)). Again, this defense must be established by a preponderance of the evidence. Acquiescence under the Convention requires either an act or statement with the requisite formality, such as testimony in a judicial proceeding; a convincing written enunciation of rights; or a consistent attitude of acquiescence over a significant period of time. Friedrich, 78 F.3d at 1070; Antunez-Fernandes, 259 F.Supp.2d at 813. But, subsequent acquiescence requires more that an isolated statement to a third party.
In Friedrich, the court weighed contradictory testimonial evidence by the parties concerning whether the husband told his wife that he consented to the removal of their children. See Friedrich 78 F.3d at 1069. That court relied on the respondent's unannounced "deliberately secretive" departure from the habitual residence, ignoring statements the husband allegedly made to third parties. Id. (finding that the deliberately secretive nature of her actions is extremely strong evidence that [the petitioner] would not have consented to the removal of their child).
Courts in the United States, England, and France have determined that acquiescence is a subjective test. Antunez-Fernandes, 259 F.Supp.2d at 813. The English House of Lords suggests that "Acquiescence is a question of the actual subjective intention of the wronged parent, not of the outside world's perception of his intentions." Id.; Re H and Others, (1997) 2 W.L.R. 563, 573B (citing Friedrich, *127 78 F.3d at 1060; Wanninger v. Wanninger, 850 F.Supp. 78 (D.Mass. 1994); Horlander v. Horlander, 1992 Bull. Civ. I, No. 91-18.177). The high court in France, refused to find acquiescence where intention was not "unequivocal." In Wanninger v. Wanninger, a Massachusetts court discounted circumstantial evidence of acquiescence. The court established that the petitioner's intentions were not to acquiesce, but to reconcile his marriage. See Wanninger, 850 F.Supp. at 82 (de-emphasizing letters petitioner wrote to a third party and relying on the petitioner's statements and letters of reconciliation made to his wife).
Here, Piret testified unequivocally that he did not, at any time, consent to the children's removal from Belgium. He sought assistance from Belgian authorities and charged his wife with kidnapping. All of Piret's actions show an intent to have his children returned to him in Belgium. Guajardo introduced no evidence of acquiescence. We find that Guajardo did not meet her burden of proving that Piret acquiesced in the removal of his children from Belgium.
D. The Children were not in "Grave Danger."
By his final point, Piret argues that the trial court erred in finding that there was a risk of potential psychological and/or physical harm if the children were returned to him to Belgium. Guajardo had the burden of proving this affirmative defense by clear and convincing evidence. See Blondin, 189 F.3d at 245.
To prove this defense, a party must show, that there was a "grave risk" that the children's return would expose them to psychological or physical harm or otherwise place them in an intolerable situation.[2]Antunez-Fernandes, 259 F.Supp.2d at 815. The focus is on the children. Id. It does not matter if Guajardo is the better parent in the long run, had good reason to leave her home in Belgium and terminate her marriage, or whether she will suffer if the children are returned to Belgium. See Nunez-Escudero v. Tice-Menley, 58 F.3d 374, 377 (8th Cir.1995); Mendez Lynch, 220 F.Supp.2d at 1364. Moreover, the exception for grave harm to the child is not license for a court in the country where the children ended up to speculate about where the children would be happiest. Friedrich, 78 F.3d at 1068.
This exception also requires the alleged physical or psychological risk to be a "great deal more than minimal." Whallon v. Lynn, 230 F.3d 450, 459 (1st Cir.2000). Only severe potential harm to the child will trigger this exception. Nunez-Escudero, 58 F.3d at 377, (quoting the Supreme Court of Canada, Thomson v. Thomson, 119 D.L.R. 4th 253, 286 (Can. 1994)). The harm must be greater than normally to be expected when taking a child away from one parent and passing the child to another parent. Mendez Lynch, 220 F.Supp.2d at 1364; Whallon, 230 F.3d at 459. The harm of separating a child from the primary caretaker does not satisfy the Article 13b exception. See Rydder v. Rydder, 49 F.3d 369, 372 (8th Cir.1995); Nunez-Escudero, 58 F.3d at 376. Adjustment problems that would attend the relocation of most children is not *128 sufficient. Friedrich, 78 F.3d at 1067. The Blondin court concluded:
In other words, at the one end of the spectrum are those situations where repatriation might cause inconvenience or hardship, eliminate certain educational or economic opportunities, or not comport with the child's preferences; at the other end of the spectrum are those situations in which the child faces a real risk of being hurt, physically or psychologically, as a result of repatriation. The former do not constitute a grave risk of harm under Article 13b; the latter do.
Blondin, 238 F.3d at 162.
There is no evidence that Piret either physically or psychologically abused the children. See Antunez-Fernandes, 259 F.Supp.2d at 816 (denying a finding of "grave risk" when mother did not claim that returning the children to France would present a grave risk of physical or psychological harm or place the children in an intolerable situation; mother alleged nothing more than adjustment problems that would from relocation of the children); Rydder, 49 F.3d at 373 (finding that mother did not satisfy "grave risk" exception of potential harm to children upon return to country of habitual residence where mother presented no evidence of specific harm to children).
In the cases we have found where a court did make a finding that a "grave risk" of physical or emotional harm if repatriation were to occur, substantial evidence of this fact was presented to the court. For instance, in Rodriguez v. Rodriguez, 33 F.Supp.2d 456, 459-60 (D.Md.1999), the court found that the mother had satisfied the clear and convincing standard of showing that returning the children to Venezuela would subject them to grave risk, and denied the request for return. There, the oldest son, who was twelve at the time he was removed, testified that his father first began to beat him when he was six years old and continued to beat him throughout his life. In addition to twice monthly physical assaults, his father routinely demeaned him and called him "bad words." Id. The child also witnessed his father routinely beating his mother. Additionally, a teacher observed the father kicking the child and that the child's father was asked on at least one occasion to speak to a school psychologist about the child's abuse. Id. at 460. A psychologist testified without reservation that the return of the children would cause post traumatic stress syndrome and that return of the child to Venezuela would expose him to a grave risk of psychological and/or physical harm and would subject him to an intolerable situation. Id. at 461.
Although denied by Piret, Guajardo testified that he physically abused her. She presented no evidence that Piret abused either child. Even with allegations of physical abuse to the spouse, grave risk is not proven when there is no evidence that the non-abducting party physically abused the children. See Antunez-Fernandes, 259 F.Supp.2d at 816.
Moreover, this exception applies only 1) when returning the child meant sending him to a zone of war, famine or disease, or 2) in cases of serious abuse or neglect, or extraordinary emotional dependence, when the country of habitual residence for whatever reasons may be incapable or unwilling to give the child adequate protection. Friedrich, 78 F.3d at 1069.
There is no evidence in the record that Piret physically or psychologically abused either child, and there is no evidence that a court in Belgium is incapable or unwilling to give the children adequate protection. Consequently, we find that Guajardo failed to prove by clear and convincing evidence that the children were in grave risk of physical or psychological harm if returned to Belgium, and the trial court *129 erred in so holding. Issue three is sustained.

IV.

Conclusion
We hold that the trial court erred in denying Piret's petition to return his children to Belgium because (1) Piret commenced proceedings requesting the children's return within one year after their removal, (2) Guajardo did not prove that the children were "well-settled" in their new environment, (3) Piret did not acquiesce in his children's removal, and Guajardo did not prove that the children were in "grave danger" of potential psychological and/or physical harm if returned to Belgium. Accordingly, we reverse the trial court's judgment and render judgment, according to the Hague Convention and ICARA, that the children be returned to their country of habitual residence, Belgium.
NOTES
[1] 42 U.S.C.A. § 11606(a) states that "the President shall designate a Federal agency to serve as the Central Authority for the United States under the Convention." President Reagan, by Executive Order No. 12648, 53 Fed.Reg. 30637, designated the Department of State as the Central Authority. The Department of State then promulgated regulations designating the National Center for Missing and Exploited Children as the organization to perform the operational functions with respect to applications under the Convention. See 22 C.F.R. § 94.6.
[2] The United States Department of State has stated that an "intolerable situation" was not intended to encompass situations such as return to a home where money is in short supply, or where educational or other opportunities are more limited than in the new country. It gave as an example of "intolerable situation" where the custodial parent sexually abuses a child. 51 Fed.Reg. at 10,510. Mendez Lynch, 220 F.Supp.2d at 1364-1365; 51 Fed.Reg. 10494-01 (March 26, 1986). Because the trial court did not make this finding, we will not address it.