

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-18-00001-CV

_____

IN THE INTEREST OF E.S.E., A CHILD

On Appeal from the 307th District Court
Gregg County, Texas
Trial Court No. 2015-1240-DR

Before Morriss, C.J., Moseley and Burgess, JJ.
Memorandum Opinion by Chief Justice Morriss

## MEMORANDUM OPINION

In 2014, Swedish citizens Jorgen Astrand and his wife, Fahimeh Astrand, jointly decided to immigrate to the United States with their eight-year-old daughter, Elin.[1] Pursuant to their plan, Fahimeh obtained an F-1 student visa, enrolled at Kilgore College, and moved with Elin to Gregg County, Texas, and settled in, while Jorgen, an orthopedic surgeon, remained in Sweden and attempted to obtain a Texas medical license.

Once it became apparent that Jorgen would be unable to obtain a license to practice medicine in the U.S., he requested that his wife and daughter return to Sweden. Fahimeh refused and filed an original petition in a suit affecting the parent-child relationship (SAPCR). Jorgen petitioned for Elin's return pursuant to the Hague Convention on Civil Aspects of International Child Abduction (Hague Convention), which "protect[s] children internationally from the harmful effects of their wrongful removal or retention and . . . establish[es] procedures to ensure their prompt return to the State of their habitual residence," as implemented by the International Child Abduction Remedies Act (ICARA).[2] The trial court denied Jorgen's Hague Convention claim and entered a final order in the SAPCR that named the parties joint managing conservators, with Fahimeh having the exclusive right to designate the child's primary residence. Although the trial court granted Jorgen possession of and access to Elin, it required all of Jorgen's visits with the child to occur in the U.S.

---

[1]We use an alias to protect the privacy of the minor child. *See* TEX. R. APP. P. 9.9(a)(3).

[2]Hague Convention on Civil Aspects of International Child Abduction, pmbl., Oct. 25, 1980, T.I.A.S. No. 11670, 1434 U.N.T.S. 48, 19 I.L.M. 1501, *codified by* the International Child Abduction Act, 22 U.S.C. §§ 9001–9011 (formerly 42 U.S.C. §§ 11603–11610).

On appeal, Jorgen argues that the trial court erred in denying his claim under the Hague Convention and in requiring him to come to the U.S. to exercise his rights to visit Elin, a requirement he characterizes as extreme. We affirm the trial court's judgment because (1) denying the Hague Convention claim was within the trial court's discretion and (2) requiring Jorgen's visits with Elin to be in the U.S. was within the trial court's discretion.

*(1)     Denying the Hague Convention Claim Was within the Trial Court's Discretion*

Fahimeh's sister, Faezeh Horaney, and Elin's maternal cousins lived in Gregg County, Texas. In July 2014, Fahimeh moved with Elin into Horaney's home, enrolled Elin in a local school, and registered herself in a dental hygienist program at Kilgore College. Fahimeh soon decided to rent a house near Horaney's house. Jorgen covered the cost of the rental home, paid for a car for Fahimeh, and, from August to December of 2014, paid $23,300.00 to provide for Fahimeh and Elin's living expenses.

Fahimeh refused to move back to Sweden with Elin after it became apparent that Jorgen would be unable to practice medicine if he joined them in the U.S. As a result, Jorgen petitioned for divorce in Sweden. On July 6, 2015, Fahimeh filed an original SAPCR petition in Gregg County and requested that she and Jorgen be appointed as joint managing conservators of Elin, with Fahimeh having the exclusive right to determine the child's primary residence.[3] Jorgen filed a waiver of service of citation and agreed that the case could be "taken up and considered by the Court without further notice to [him]." However, Jorgen reserved all rights "with respect to the

---

[3]Jorgen continued to make monthly payments to Fahimeh throughout 2015.

terms and conditions of [his] conservatorship, support, and parental rights and duties related to"

Elin.

On August 7, 2015, Fahimeh and Jorgen entered into an agreed parenting plan. After determining that Elin was a resident of Gregg County, on October 23, 2015, the trial court entered an order approving the agreed parenting plan, which the trial court determined was in the child's best interests. Pursuant the terms of the agreed parenting plan, the trial court appointed Fahimeh and Jorgen joint managing conservators of Elin, required them each to have the duty to support Elin during their periods of possession, set forth the terms of possession of and access to Elin, which were not restricted to the U.S., and granted Fahimeh the exclusive right to designate the child's primary residence, without regard to geographic location.

On April 1, 2016, a Swedish court granted Jorgen and Fahimeh's divorce. On April 5, 2016, while the property division in the divorce proceeding was pending, Fahimeh filed a motion seeking child support because Jorgen had stopped making monthly payments to Fahimeh.[4] On August 22, 2016, Jorgen alleged that Fahimeh had failed to comply with the trial court's order of possession of and access to Elin by failing to surrender the child to him during his period of possession. Following his motion for enforcement, on September 13, 2016, Fahimeh filed an amended petition in the SAPCR, which sought to establish her as Elin's sole managing conservator and deny Jorgen possession of and access to the child. Two days later, Fahimeh and Jorgen entered into a Rule 11 agreement specifying that, among other things, Fahimeh would surrender Elin as set out in the trial court's order providing for possession of and access to Elin, Jorgen would not

---

[4]Jorgen timely answered and requested that relief sought in Fahimeh's motion be denied.

4

take the child out of Texas, and Elin would have unrestricted telephone access with both parents at all times.

On December 8, 2016, Jorgen filed a counter-petition in the SAPCR asserting rights under the Hague Convention and requesting Elin's immediate removal and return to Sweden so that issues related to Elin's custody could be decided by a Swedish court. At a February hearing, Fahimeh testified that she did not plan on returning to Sweden with Elin. She added that Elin was ten years old, was attending school in Gregg County, along with her cousins, and had made many new friends. According to Fahimeh, after the execution of the agreed parenting plan, Jorgen sought sole custody of Elin from a Swedish court and prayed that Sweden be declared the child's primary residence. This led Fahimeh to fear that Jorgen would not return Elin if he was allowed to take her to Sweden. Jorgen testified that the Swedish court dismissed his lawsuit seeking custody of Elin after concluding that it did not have jurisdiction over the case as a result of the Gregg County litigation. Jorgen assured the Texas trial court that it would not keep Elin in Sweden since doing so would constitute a criminal act.

Following the hearing, the trial court entered temporary orders requiring Fahimeh and Elin to comply with the provisions of the agreed parenting plan, but modified the plan by enjoining Jorgen from removing the child from the United States. The trial court also set the SAPCR for a final hearing. Before the final hearing, Jorgen filed a motion requesting the trial court's permission to allow Elin to visit her sick grandfather in Sweden. In support of this request, Jorgen attached a letter written by Dr. Artur Schmidtchen, a dermatologist and venereologist, stating that Elin's

grandfather, Hans Astrand, was experiencing heart failure and memory loss, and could no longer travel by airplane. The trial court did not rule on this motion until after the final hearing.

At the final hearing, Fahimeh testified that Schmidtchen was Jorgen's friend, and Jorgen admitted that Schmidtchen was not his father's treating physician. However, he testified that Schmidtchen visited his father before writing the letter and added that Elin was his father's only grandchild. Jorgen also testified that he would take Elin to visit her extended family and friends in Sweden. Jorgen explained that Elin had many benefits as a Swedish citizen, such as free education and universal healthcare, and pled for the trial court to allow visits in Sweden. Jorgen also testified that Elin's Swedish used to be excellent but was now "[n]ot very good," implying that improving her Swedish language skills by visiting the country would be in the child's best interests.

Fahimeh testified that she speaks Swedish with Elin at home and that visitation in Sweden would not be in Elin's best interests. According to Fahimeh, Elin was not always happy to see Jorgen and had complained that she did not sleep well when visiting him because Jorgen was living with a friend who made Elin feel uncomfortable. Fahimeh testified, and text messages and photographs exchanged with Jorgen demonstrated, that Elin's hair was so tangled after spending two weeks with her father that she was forced to cut it.[5] Fahimeh also said that Elin had been sick after visits with Jorgen and did not believe him capable of adequately caring for the child.

---

[5]Jorgen admitted that he mistakenly assumed Elin could take care of her own hair and recognized the problem with her unmanageable tangles too late.

According to Horaney, Elin had sores on her face and bottom after returning from a visit with Jorgen.

Kalsey Goller, a licensed professional counselor for Winstead Psychological Services, testified that she had six counseling sessions with Elin, who had expressed worry about visiting Jorgen in Sweden because she feared that he would not allow her to return. Elin told Goller that Jorgen became angry when driving, which made her nervous, and that she did not sleep well when she was with him. Goller had never spoken to Jorgen.

In order to establish that visiting Sweden could pose a problem for Elin, Fahimeh introduced testimony from Estonia Graves, a designated school official for Kilgore College. Graves testified that Fahimeh had an F-1 student visa when she enrolled at the school in the Fall of 2014. Graves explained that Fahimeh's visa was expired, but that her F-1 status would not expire as long as she was enrolled in school. According to Graves, this meant that Fahimeh could remain in the U.S., but could not return once she left the country until she renewed her visa. Because Elin had an F-2 visa, which was dependent on the F-1 visa, Graves explained that Elin could not return to the U.S. if she were to visit Jorgen in Sweden because Fahimeh's visa was expired. As a result, Fahimeh would have to return to Sweden, reapply for the visa, and hope for its renewal in order to return with Elin to the U.S.

After the hearing, Jorgen re-urged his Hague Convention claims. Fahimeh's response referenced the trial court's finding that Elin was a resident of Gregg County, pointed out that Jorgen had entered into an agreed parenting plan, and argued that Jorgen could not now contest the trial court's jurisdiction after invoking it. At the hearing, Jorgen admitted that the Swedish

7

court ruled it did not have jurisdiction over the custody dispute and that it was everyone's intentions to make the U.S. their permanent home when Fahimeh moved into Gregg County with Elin in 2014.

Ultimately, the trial court denied Jorgen's Hague Convention claim and entered final orders naming the parties joint managing conservators, with Fahimeh having the exclusive right to designate the child's primary residence, without restriction. In its order, the trial court noted that Jorgen did not assert wrongful removal and that his pleadings did not indicate when Fahimeh allegedly began to wrongfully retain Elin. Pointing to the agreed parenting plan, the trial court found "that Elin's removal from Sweden and her retention in the United States was not wrongful, as it was not made in breach of the rights of custody." The trial court further found that Jorgen failed to show that Sweden was the child's habitual residence before any alleged wrongful retention in the U.S., and that the intent of the parties that the child reside in the U.S. was "abundantly clear." Noting that Elin had been residing in the U.S. since the Fall of 2014, was enrolled in school here, had made friends here, and resided with other members of her maternal family, the trial court concluded that Elin was acclimatized to the U.S.[6]

---

[6]The trial court entered the following order related to possession of and access to Elin and child support:

-[Jorgen] will have the right to possession of the child as follows:

-One weekend [per] month, with at least 14 days' notice to [Fahimeh];

-Every Christmas from noon on December 26 through 6:00 p.m. the Friday before the child's school resumes from the Christmas break;

-Every Spring Break;

-14 Consecutive days in the month of June and 14 Consecutive days in the month of August. [Jorgen] must provide notice of these 14 day visitations on or before April 1 of each year.

Jorgen filed a motion for new trial. After a hearing, in which the trial court interviewed Elin in chambers, Jorgen's motion for new trial was denied. Jorgen appeals.

The U.S. and Sweden are both signatories to the Hague Convention, which was drafted with the purpose to (1) "preserv[e] the 'pre-abduction status quo custody arrangements' between the parties and (2) deter[] a parent from 'crossing international boundaries in search of a more sympathetic court.'" *In re A.V.P.G.*, 251 S.W.3d 117, 122 (Tex. App.—Corpus Christi 2008, no pet.). Under the Hague Convention, removing or retaining a child from his or her habitual residence is wrongful if

> a       It is in breach of rights of custody attributed to a person . . . under the law of the State in which the child was habitually resident immediately before the removal or retention; and
> b       at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

Hague Convention, art. 3, 19 I.L.M. 1501. If a child has been wrongfully removed or retained under Article 3, and less than one year has elapsed between the commencement of proceedings and the date of the wrongful removal or retention, a court must "order the return of the child forthwith." Hague Convention, art. 12, 19 I.L.M. 1501. "[E]ven where the proceedings have been

---

Moreover the 14 consecutive days in August must conclude at least by 6:00 p.m. on the Friday before school starts;

-All of [Jorgen's] visitations must take place in the United States. In this regard the Court Orders that [Jorgen] not remove the child from the United States, unless there is a written agreement between [Jorgen] and [Fahimeh] to do so;

-[Jorgen] is Ordered to pay $833.33 in child support monthly, beginning in July 2017;

-[Fahimeh] is Ordered to make all efforts to obtain affordable health insurance for the child. The premium is to be paid 2/3 by [Jorgen] and 1/3 by [Fahimeh].

commenced after the expiration of the period of one year" the trial court "shall also order the return

of the child, unless it is demonstrated that the child is now settled in its new environment." *Id.*

However,

> [n]otwithstanding the provisions of the preceding Article, the judicial or administrative authority of the requested State is not bound to order the return of the child if the person, institution or other body which opposes its return establishes that --
>
> a       the person, institution or other body having the care of the person of the child was not actually exercising the custody rights at the time of removal or retention, or had consented to or subsequently acquiesced in the removal or retention; or
>
> b       there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation.
>
> The judicial or administrative authority may also refuse to order the return of the child if it finds that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views.
>
> In considering the circumstances referred to in this Article, the judicial and administrative authorities shall take into account the information relating to the social background of the child provided by the Central Authority or other competent authority of the child's habitual residence.

Hague Convention, art. 13, 19 I.L.M. 1501. "The premise of the Hague Convention is that the

country in which the child has his [or her] 'habitual residence' is in the best position to determine

questions of parental custody and access." *Livanos v. Livanos*, 333 S.W.3d 868, 876 (Tex. App.—

Houston [lst Dist.] 2010, no pet.) (citing *A.V.P.G.*, 251 S.W.3d at 122)).  Thus, a court hearing this

type of Hague Convention claim "has the authority to determine the merits of an abduction claim,

but not the merits of the underlying custody claim." *Id.* (quoting *A.V.P.G.*, 251 S.W.3d at 122).

10

Here, Jorgen argues that the trial court erred in denying his Hague Convention claims because (a) Sweden, not the U.S., was Elin's habitual residence, and (b) the trial court erred in concluding that Jorgen consented to Elin's removal because Fahimeh did not specifically plead Article 13 of the Hague Convention as an affirmative defense. "Neither [Article 3 of] the Hague Convention nor ICARA apply unless a child has been removed or withheld from the child's habitual residence." *Flores v. Contreras*, 981 S.W.2d 246, 249 (Tex. App.—San Antonio 1998, pet. denied). Because we find that the trial court did not err in determining that the U.S. was Elin's habitual residence, we conclude that Jorgen's Hague Convention claim was properly denied.[7]

"The question of habitual residence is a mixed question of law and fact." *In re S.J.O.B.G.*, 292 S.W.3d 764, 776 (Tex. App.—Beaumont 2009, no pet.) (citing *Flores v. Contreras*, 981 S.W.2d 246, 249 (Tex. App.—San Antonio 1998, pet. denied)); *see In re J.J.L.-P.*, 256 S.W.3d 363, 372 (Tex. App.—San Antonio 2008, no pet.). "When a matter involving both factual determinations and legal conclusions is decided by the trial court, Texas courts generally employ the abuse of discretion standard." *S.J.O.B.G.*, 292 S.W.3d at 776 (quoting *Flores*, 981 S.W.2d at 249). "In applying that standard, we defer to the trial court's factual determinations if they are supported by the evidence, but review the trial court's legal determinations de novo." *Id.* "We determine first whether the trial court has sufficient evidence on which to exercise its discretion, and second, whether the trial court erred in its application of that discretion." *Id.*

While the Hague Convention does not define "habitual residence," courts have concluded that it "refers to a child's customary residence before his or her removal or retention." *S.J.O.B.G.*,

---

[7] As a result of our findings, we need not address Jorgen's complaint regarding the affirmative defense of consent.

11

292 S.W.3d at 777 (quoting *J.J.L.-P.*, 256 S.W.3d at 372). "The habitual residence inquiry proceeds on a case-by-case basis, and it focuses not on a child's domicile or legal residence but where the child physically lived 'for an amount of time sufficient for acclimatization and which has a 'degree of settled purpose' from the child's perspective.'" *J.J.L.-P.*, 256 S.W.3d at 372 (quoting *Flores*, 981 S.W.2d at 249).

"[T]he first step toward acquiring a new habitual residence is forming a settled intention to abandon the one left behind. Otherwise, one is not habitually residing; one is away for a temporary absence of long or short duration." *S.J.O.B.G.*, 292 S.W.3d at 779 (quoting *Mozes v. Mozes*, 239 F.3d 1067, 1075 (9th Cir. 2001)); *see Larbie v. Larbie*, 690 F.3d 295, 310 (5th Cir. 2012). In making a determination on the child's habitual residence,

> [f]irst, the court should inquire into the shared intent of those entitled to fix the child's residence (usually the parents) at the latest time that their intent was shared. In making this determination the court should look, as always in determining intent, at actions as well as declarations. Normally, the shared intent of the parents should control the habitual residence of the child. Second, the court should inquire whether the evidence unequivocally points to the conclusion that the child has acclimatized to the new location and thus has acquired a new habitual residence, notwithstanding any conflict with the parents' latest shared intent.

*S.J.O.B.G.*, 292 S.W.3d at 780 (quoting *Gitter v. Gitter*, 396 F.3d 124, 134 (2nd Cir. 2005)).

Unlike many other cases analyzing Hague Convention claims, the parents' shared intention here is undisputed. Jorgen and Fahimeh both testified that they had spoken about moving to the U.S. and that, at the time Fahimeh moved with Elin to Gregg County in 2014, it had been their intention to make the U.S. their permanent home. In addition to their declarations, Fahimeh and Elin's actions in enrolling in school and obtaining a rental home, instead of continuing to live with family, supported their intent to make the U.S. their permanent home. Jorgen appeared to share

12

this intent, since he acquiesced to Gregg County's authority to decide custody issues and agreed to allow Fahimeh to designate Elin's primary residence in the U.S. in the agreed parenting plan and Rule 11 agreement. Although Jorgen's intent changed when "circumstances changed" after he was advised that he would be unable to obtain a medical license in the U.S., Fahimeh's intent to make the U.S. Elin's permanent home never faltered.

Additionally, the trial court's finding that Elin acclimatized to the U.S. was supported by sufficient evidence.[8] The trial court heard that Elin had been living in the U.S. since Fall 2014, had cousins and family nearby, enrolled in school where she made many new friends, and no longer had very good Swedish language skills. The court also heard testimony that Elin did not sleep well in Sweden and was anxious about visiting her father in Sweden. Significantly, the trial court interviewed the child in chambers before issuing its finding and noted that a Swedish court had declined to exercise jurisdiction as a result of the Gregg County proceedings.

In light of the appellate record, and after applying the appropriate deference to the trial court's factual findings, we conclude that the trial court properly determined the U.S. to be Elin's habitual residence. "A petitioner establishes wrongful removal [or retention] by proving by a preponderance of the evidence that the removal of the child was 'made in breach of the rights of custody of the petitioner under the law of the country in which the child habitually resided immediately before the removal.'" *Livanos*, 333 S.W.3d at 876 (quoting *In re J.G.*, 301 S.W.3d

---

[8]"The Convention requires that if proceedings seeking return of the children are commenced within one year from the date of abduction, the court 'shall' order the return of the child." *A.V.P.G.*, 251 S.W.3d at 124. The record here demonstrated that Jorgen filed for divorce in July 2015 after Fahimeh refused to move to Sweden with Elin. Because more than one year passed between Elin's retention in the U.S. and Jorgen's assertion of his Hague Convention claim on December 8, 2016, it was proper for the trial court to determine whether Elin was settled in the U.S. *See* Hague Convention, art. 12, 19 I.L.M. 1501.

376, 378–79 (Tex. App.—Dallas 2009, no pet.)).  Because the U.S. was and is Elin's habitual residence, and Jorgen agreed to the custodial arrangements in the agreed parenting plan and Rule 11 agreement, Jorgen failed to prove that Fahimeh's retention of Elin was made in breach of his rights of custody.

We overrule this point of error.

*(2)     Requiring Jorgen's Visits with Elin to Be in the U.S. Was within the Trial Court's Discretion*

The trial court's order set forth Jorgen's period of possession in accordance with Section 153.313, which describes the terms of a standard possession order for parents living more than 100 miles apart.  *See* TEX. FAM. CODE ANN. § 153.313 (West 2014).  The order, however, required Jorgen's visits to occur in the U.S.  Jorgen asserts that the trial court erred in imposing, "without the necessary findings," the requirement that his visits with Elin take place in the U.S.  Because we find ample evidence that Elin's best interests support the trial court's restriction, we disagree.

"The trial court has discretion to determine the terms of possession or access by a possessory conservator."  *In re Walters*, 39 S.W.3d 280, 285 (Tex. App.—Texarkana 2001, no pet.).  "The terms of an order that denies possession of a child to a parent or imposes restrictions or limitations on a parent's right to possession of or access to a child may not exceed those that are required to protect the best interest of the child."  TEX. FAM. CODE ANN. § 153.193 (West 2014).  "The test for abuse of discretion is whether the trial court acted without reference to any guiding rules or principles, i.e., whether the act was arbitrary or unreasonable."  *Walters*, 39 S.W.3d at 285.  "The best interest of the child shall always be the primary consideration of the

14

court in determining the issues of conservatorship and possession of and access to the child." TEX. FAM. CODE ANN. § 153.002 (West 2014).

Jorgen argues that the restriction is extreme because of the expense required for his travel to the U.S. Pursuant to the terms of the Rule 11 agreement, executed on September 15, 2015, and the trial court's temporary orders entered thereafter, Jorgen's visits with Elin had been restricted to the U.S. Although the trial court acknowledged the "significant strain" in the father-daughter relationship as a part of their geographical separation, the trial court found that (a) Jorgen made multiple visits to the U.S. to see Elin and (b) visitation in Sweden would cost Jorgen more money since he testified he would fly to the U.S. to personally escort Elin because he did not want her to travel alone internationally.[9]

Moreover, despite Jorgen's concerns, ample evidence supported the trial court's best-interest determination. The trial court concluded that Elin was closer to Fahimeh, whom she had been living with since Fall 2014. Fahimeh had an expired F-1 visa. The trial court heard evidence that, as a result of Fahimeh's status, Elin could face difficulty obtaining another F-2 visa to return to the U.S.—her habitual residence—if she were allowed to visit Jorgen in Sweden. Fahimeh testified that, after the execution of the agreed parenting plan, Jorgen sought sole custody of Elin from a Swedish court and prayed that Sweden be declared the child's primary residence, which led her to fear that Jorgen would not return Elin if she visited Sweden. The trial court found Fahimeh's fears reasonable under these circumstances, and testimony from Elin's counselor

---

[9]Jorgen also argues that the trial court's order prevented Elin from visiting her family in Sweden. However, the trial court heard testimony, including Jorgen's, suggesting that Elin had not often visited Swedish relatives and that she was close with maternal relatives living in Texas.

established that Elin was also scared that Jorgen would harbor her in Sweden against her wishes. During the trial court's interview with Elin, the child informed the court that she did not sleep well in Jorgen's care and had "anxiety and trepidation" when thinking of leaving the country with him.

The evidence demonstrated that Elin has a new life in the U.S. She enjoyed the company of relatives and many new friends made at school, and had generally acclimated to her new habitual residence. In light of the record before us, we cannot conclude that the trial court abused its discretion in finding that Elin's return to Sweden, which could potentially cause her to involuntarily abandon her habitual residence, was not in the child's best interests. "The trial court does not abuse its discretion in fashioning restrictions on a parent's possession and access if the record contains evidence to support a finding that such restrictions are in the best interest of the child[]." *In re P.A.C.*, 498 S.W.3d 210, 219 (Tex. App.—Houston [14th Dist.] 2016, pet. denied). Accordingly, we overrule this point of error.

We affirm the trial court's judgment.

Josh R. Morriss, III
Chief Justice

Date Submitted:     June 6, 2018
Date Decided:       June 20, 2018

16