**In the Interest of S.J.O.B.G.**

**No. 09–08–00160–CV.**

Court of Appeals of Texas, Beaumont.

Submitted Dec. 18, 2008.

Decided July 16, 2009.

John K. Grubb, Cindy M. Aguirre, John K. Grubb & Associates, P.C., Houston, for appellant.

Ruth Lavada Vernier, Robert Douglas Kelly, The Woodlands, for appellee.

Before GAULTNEY, KREGER, and HORTON, JJ.

## OPINION

CHARLES KREGER, Justice.

S.J.O.B.G. ("J.O.B.") is a twelve year old girl who suffers from severe juvenile rheumatoid arthritis. A conflict developed primarily between her treating physicians in Norway and the child's mother, Elizabeth, over the proper treatment of J.O.B.'s progressively debilitating disease. In August 2007, Elizabeth and her three daughters (J.O.B., K.B., J.B.) fled from Norway to the United States after Child Welfare Services of the Municipality of Baerum, Norway ("CWS"), petitioned the court in Norway for the transfer of the responsibility

for the care of J.O.B. to CWS, and removed J.O.B. from Elizabeth's custody and placed her in the foster care of her father, Harry.

In January 2008, CWS filed a petition pursuant to the Hague Convention on the Civil Aspects of International Child Abduction ("Hague Convention"), October 25, 1980, T.I.A.S. No. 11670, 1343 U.N.T.S. 89, reprinted in 51 Fed. Reg. 10494 (March 26, 1986), and the International Child Abduction Remedies Act ("ICARA"), 42 U.S.C.A. §§ 11601–11611 (West 2005). The petition sought the return of J.O.B. to Norway.[1] The trial court denied the petition, and this appeal followed.

## FACTUAL BACKGROUND

As the determination of the country of habitual residence of the child is pivotal to the issues before this Court, a detailed review and a discussion of the family history are necessary and helpful. Additionally, we include a review of J.O.B.'s medical treatment, since much of the family's travel between Norway and the United States appears, at least in part, to be in reaction to ever-increasing pressure by J.O.B.'s treating physicians to get Elizabeth to acquiesce to more conventional treatment for J.O.B.'s serious childhood illness.

Harry and Elizabeth were married in Sweden and moved to Norway in 1994. The record shows that Harry asserts he is a citizen of Sweden, while Elizabeth claims citizenship in both Norway and the United States. Their daughter, J.O.B., at the center of this dispute, was born in Sweden in 1996. In her First Amended Answer on file with the trial court, Elizabeth asserts that J.O.B. is a citizen of the United States, Sweden, and Norway. J.O.B. has two sisters, a twin sister K.B., and an older sister, J.B. The family went to Sweden for the birth of the twins, but returned to Norway shortly thereafter.

In December 1999, J.O.B. was diagnosed with severe juvenile rheumatoid arthritis ("JRA"). J.O.B. was three years old when she was first seen at the National Hospital in Norway (the "National Hospital" or "Hospital") and diagnosed with her illness. The record reflects that J.O.B.'s parents, particularly Elizabeth, were skeptical regarding some of the recommended treatment and preferred to try "natural medicine" in some instances. By May of 2000, the chief physician at the Hospital found J.O.B.'s condition had worsened. In late summer of 2000 the family advised the Hospital that they were planning to go to Hawaii to live there for several months.

In August 2000, Elizabeth and her three daughters moved to Maui, Hawaii. The move to Hawaii was reportedly motivated by a desire for J.O.B. to live in a warmer climate. Harry stayed in Norway to pursue a career as a dentist. Harry sold the family home in Norway and lived with friends in Norway while his wife and daughters maintained a residence in Hawaii. While living in Hawaii the girls attended public school. Elizabeth and her daughters lived in Hawaii for ten months.

J.O.B. was first seen by doctors at the Shriners Hospitals for Children in the Maui arthritis clinic in October 2000, where Dr. Kurahara found that she suffered from "severe systemic JRA with polyarticular arthritis." She was started on prednisone and ibuprofen but when the doctors recommended adding Plaquenil to her regimen, Elizabeth declined. At that

1. While Harry, the father of J.O.B., appeared and testified at the hearing on the petition, Harry did not join the lawsuit as a petitioner nor did he otherwise seek the return of his other two daughters in these proceedings. However, Harry testified at trial that he had initiated proceedings in Norway to gain custody of all three of his daughters.

time, the doctors met with Elizabeth and expressed their opinion that J.O.B.'s arthritis "was severe enough that she would have a very poor outcome." Elizabeth subsequently failed to follow up with any further immediate treatment for J.O.B. at the Maui clinic.

In the summer of 2001, Elizabeth and her daughters returned to Norway to visit Harry. The treating physicians at the National Hospital expressed concern at Elizabeth's representations that she had unilaterally decided to discontinue giving certain medications to J.O.B. Elizabeth explained that she had adjusted J.O.B.'s diet instead and her illness had declined. Elizabeth continued to desire non-conventional methods of treatment. However, upon re-examining J.O.B., the doctors observed new problems with J.O.B.'s condition and recommended treatment with conventional medications. Elizabeth testified that, at that time, she did not want J.O.B. to be treated in Norway because they were only in Norway to visit Harry and planned to return to Maui.

Elizabeth and her daughters were scheduled to return to Maui on September 14, 2001. However, their return flight was cancelled as a result of the September 2001 terrorist attack in the United States. Their return flight was rescheduled for later that month but then cancelled again. Unsure when they would be able to return to the United States, Elizabeth enrolled all three girls in school in Norway. During this time the family was staying with friends because Elizabeth and Harry no longer had a house in Norway. Elizabeth and Harry eventually rented an apartment in Norway and the family lived in their apartment in Norway for roughly a year. The family planned to relocate to Maui together in 2002.

While J.O.B. did receive some treatment for her illness in Norway in 2001, Elizabeth again refused the recommended treatment by the doctors at the National Hospital. Instead, following discharge from the Hospital in 2001, J.O.B. received treatment from a physiotherapist, homeopathist and chiropractor. As a result of Elizabeth's continued refusal to follow through with the recommended course of treatment, the Hospital contacted CWS.

Around March 2002, Elizabeth sought help from the Norway rheumatologist who initially diagnosed J.O.B. and, after testing, he recommended that she be treated with traditional medications. According to Elizabeth, J.O.B. had only been given ibuprofen. Elizabeth declined to follow the rheumatologist's recommendation. Shortly thereafter, Elizabeth informed the Hospital that the family was considering a move to Hawaii, but had not finalized their plans. Thereafter, CWS presented a case to the County Tribunal for Social Affairs of Oslo and Akershus, Norway, ("County Tribunal") regarding J.O.B.'s treatment. However, in October 2002, while the case in the County Tribunal regarding the treatment of J.O.B. was pending, the entire family moved back to Maui, Hawaii.

In anticipation of the move to Hawaii, Harry sold his dentist practice in Norway and used the money to purchase furniture so that Elizabeth could open a furniture store in Maui. Harry also co-signed a business loan for the furniture store. Elizabeth returned to Norway in December 2002 for three days for the conclusion of the County Tribunal's case regarding J.O.B.'s treatment. The County Tribunal concluded that J.O.B. was seriously ill and that her condition had worsened considerably. The tribunal determined that if J.O.B.'s parents wanted to use alternative forms of treatment, they were obligated to provide documentation that these courses of treatment had manifestly clear results. The tribunal concluded that the alternative

treatment J.O.B. had received thus far was insufficient and characterized her situation as "a serious lack of treatment" finding that the "deficiency in treatment has resulted in injury to all joints and partly also to the bone substance around the joints which could have been avoided with proper treatment." Ultimately the tribunal concluded "it was in [J.O.B.'s] best interest to receive traditional [medicine]."[2] Upon the conclusion of these proceedings Elizabeth returned to Maui.[3]

In 2003 the furniture store in Maui was struggling, and Harry returned to Norway to work and earn money to pay off some of the family's debts. Elizabeth and her three daughters lived in Maui until 2005. While living in Maui, the girls all attended school. Harry was the primary source of income during this time and paid the rent on the house in Maui, as well as his oldest daughter's private school tuition. Harry made regular visits to Hawaii, and his wife and daughters visited him in Norway during the summers.

The extent and kind of medical treatment J.O.B. received while living in Maui from 2002 to 2005 was disputed. The records show that doctors in Norway noted that J.O.B. was treated with antibiotics on at least two occasions during 2004 by Dr. Joel Friedman, and that doctors in Norway found significant and irreversible damage developed in J.O.B.'s joints and bone substance during 2002–2004 for lack of conventional treatment.

In January 2004, doctors in Hawaii discussed with Elizabeth and Harry that J.O.B. was at very high risk for high morbidity and mortality, and the likelihood of disability was very high for her. The doctor reviewed with them J.O.B.'s deterioration since 2001. The doctor indicated his preference was to immediately start J.O.B. on conventional medications. The doctor noted that Elizabeth was reluctant to begin J.O.B. on any medicines. J.O.B. was still only being given ibuprofen for her condition by her parents. The doctor told them then that if they absolutely refused to begin therapy on the recommended medicines, the doctor would have to decide whether the threat to J.O.B.'s health was grave enough to involve Child Protective Services in Hawaii. The records show that in May 2004, J.O.B. was still not receiving treatment with any disease modifying agents.

In the summer of 2005, Elizabeth and her daughters planned a trip from Maui to Norway. J.O.B. was around nine years old at the time. Both the intended duration and purpose of this trip were disputed by the parents in the underlying proceedings. Harry testified that his wife and daughters were returning to Norway in July 2005 because the family could no longer afford medical care for J.O.B. in the United States, and because Harry could no longer financially sustain them in Maui.[4] Harry testified that Elizabeth was to sell everything they had in Hawaii, and that he

2. The tribunal made an exception with respect to a specific medication objected to by Elizabeth that had not been finally approved for use on children. The tribunal determined that treatment with an alternative drug, to which less risk was attached, was appropriate.

3. Elizabeth and Harry challenged this decision in Asker and Baerum District Court in January 2003, and a hearing was scheduled for September of that year. However, due to

an illness of their counsel and ultimately a change in counsel, the case was postponed until August 2004. In July 2004, Elizabeth and the girls were still in Maui. At that time they withdrew their appeal from the District Court, and stated they would comply with the Tribunal's "resolution or treatment."

4. Medical care, according to the testimony, is "free for the inhabitants" of Norway.

believed she had closed the furniture store and put the merchandise in storage prior to her return to Norway. According to Harry, some of the family's personal belongings were also put in storage because they could not afford to ship them to Norway at that time. Harry testified that he paid for the plane tickets and that to his knowledge, none of the children had return-tickets to Maui.

In contrast, Elizabeth testified that the July 2005 trip to Norway was simply another summer vacation to visit Harry.[5] Elizabeth testified that she had planned to return to Maui with her daughters in August 2005. At the time of their trip, the store in Maui had not been closed and the merchandise was still inside. Elizabeth's bank account was still open, and her P.O. Box and address had not been changed. It is undisputed that prior to leaving for Norway Elizabeth moved out of the two-story rental home they had occupied in Hawaii and put furniture and some personal belongings in storage. The two-story home became problematic after J.O.B. had broken her leg and was confined to a wheelchair. Elizabeth had instead, found a one-story home that she hoped to rent upon their return to Maui in August 2005. Elizabeth stated that the family belongings were in storage temporarily until they could be moved into the new rental house when they returned to Maui. They also had two cats they left in a kennel in Maui, prepaid through August 2005.

Elizabeth had maintained some contact with the doctors at National Hospital in Norway while living in Maui, specifically in 2004 and 2005, when she sought advice and assistance regarding rehabilitation of a broken femur sustained by J.O.B. at school. The National Hospital advised Elizabeth to bring J.O.B. to Norway to receive medication and be examined. In April 2005 Elizabeth informed the Hospital that she and her daughters were still in Hawaii, and she did not have the means to fly the family back to Norway at that time. In anticipation of making a trip to Norway later that summer, Elizabeth applied to the National Hospital to receive six weeks of rehabilitation for J.O.B. during the summer of 2005.

Elizabeth testified that in the summer of 2005 J.O.B. and K.B. had round-trip tickets from Maui to Norway, with a return date of August 2005. While Elizabeth and J.B. had tickets to Norway, they had not yet purchased return-tickets to Maui at the time they left for Norway. Elizabeth stated that she changed their departure flights from July 15 to June 30 in order to get to Norway "as soon as possible" after she became concerned about Harry's mental state. Elizabeth stated that Harry had become increasingly difficult to contact by telephone, and she learned that he had missed work after he had taken too many sleeping pills. According to Elizabeth, Harry had been suicidal since 2003. Harry admitted that he hit a "low point" in 2004 as a result of being away from his children and due to the family's financial problems. However, he denied making any threats of suicide or otherwise coercing Elizabeth to return to Norway.

Elizabeth, and her three daughters, departed for Norway on June 30, 2005, and landed in Sweden on July 2. After learning that Harry was in Sweden, where the children's grandparents lived, they elected not to continue to Norway and joined Harry in Sweden at a family reunion. While in Sweden, Harry told Elizabeth he wanted a divorce. Although they had briefly discussed divorce in the past, Elizabeth

---

**5.** Elizabeth represented in her pleadings that the family traveled to Norway in the summer of 2005 with the intention of remaining there until Harry's mental condition improved.

testified she was surprised by the news. Shortly thereafter, the family traveled to Harry's apartment in Tonsberg, Norway. Elizabeth suggested she and Harry live together during the remainder of their visit and try to save their marriage. Harry, however, refused and began staying elsewhere.

Elizabeth testified that she discovered Harry was having an affair and she threatened to leave Norway. Elizabeth testified she had less than $100 available to her at that time. When she asked Harry for money, he told her he had little money himself, but he gave Elizabeth $100 and suggested that she seek government assistance in Norway. Elizabeth registered in Norway and began receiving government benefits. After Elizabeth and Harry met with a marriage counselor in July 2005, Harry applied for a formal separation.

Elizabeth rented a small two-bedroom apartment on a month-to-month lease in Baerum, Norway, where the family had lived together before they moved to Hawaii in 2000. The apartment was an hour away from Harry's apartment, but Elizabeth thought it was important for her daughters to be somewhere familiar to them. Elizabeth's oldest daughter had earlier attended first grade there, and the children expressed a preference to be in Baerum if they could not go back to Maui at that time.

In August 2005 Elizabeth enrolled the girls in school in Norway. J.O.B. completed both the 2005–2006 and 2006–2007 school years in Norway. During the majority of this time period, Elizabeth received government assistance to care for J.O.B. Although she holds a masters degree in business administration and economics from Stockholm University, Elizabeth chose not to work in order to care for J.O.B. In late September 2005, Elizabeth returned alone to Maui for two-and-one-half weeks. During this trip, Elizabeth closed the furniture store and moved the merchandise into storage. She also retrieved her daughters' cats from the kennel in Maui and returned them to Norway. Elizabeth returned to Norway in the middle of October 2005. The family lived continuously in Norway from July 2005 to August 2007.

Elizabeth testified that while living in Norway she attempted to reach a child support agreement with Harry and tried to save enough money to allow her and the girls to move back to Maui. While the record does not establish when Harry began to pay child support, it is undisputed that Elizabeth began receiving child support at some point in time, presumably under the terms of the couple's formal separation agreement or final divorce decree. Elizabeth testified, however, that after June or July 2007, she no longer received any child support from Harry. In addition to any child support from Harry, Elizabeth also received financial assistance from the government. The record shows Elizabeth paid taxes in Norway for income she received in 2005 and 2006.

While they lived in Norway, Elizabeth and the doctors at the National Hospital continued to disagree over the details of J.O.B.'s medical care. In the fall of 2005, CWS told Elizabeth that if she continued to ignore the County Tribunal's resolution regarding J.O.B.'s treatment, it would consider taking responsibility for J.O.B.'s care. Elizabeth did not want J.O.B. to be treated at National Hospital; instead, Elizabeth proposed that J.O.B. be treated at St. Olav's Hospital ("St. Olav's") in Trondheim, Norway. The doctors at St. Olav's agreed to work with Elizabeth and Harry in treating J.O.B., but believed cooperation by the parents was necessary. St. Olav's also wrote to CWS and stated that the hospital would attempt to care for J.O.B.

in accordance with the County Tribunal's resolution.

J.O.B.'s treatment at St. Olav's began in December 2005. However, the records show that Elizabeth once again began interfering with J.O.B.'s treatment with conventional medications. By September 2006, Elizabeth advised CWS that J.O.B.'s treatment was to be transferred back to the National Hospital. When doctors at the National Hospital insisted that conventional disease modifying agents be added to J.O.B.'s treatment regiment, Elizabeth informed CWS that she and the girls were returning to Hawaii.

In November 2006, Elizabeth, accompanied by her three daughters, returned to Maui. In Maui, there was a lawsuit pending, filed by Elizabeth against the State of Hawaii after J.O.B. sustained a broken leg at school. In addition, because Elizabeth still disagreed with the course of treatment being recommended by the National Hospital in Norway, she testified that she wanted a second opinion from Shriners Hospitals for Children in Hawaii.

Prior to leaving for Maui, Elizabeth met with CWS at the National Hospital. CWS agreed to make arrangements with the proper health care institution in Hawaii to ensure that J.O.B. would receive medication while on the trip and that CWS would cover the medical expenses. Elizabeth and her daughters stayed in Maui from November 2006 to February 2007 and then returned to Norway. While in Hawaii, Elizabeth, with her daughters, stayed with friends. Although it was during the school year, Elizabeth did not enroll the girls in school while in Hawaii.

After returning to Norway in early March 2007, J.O.B. was re-examined and treated at the National Hospital. Because Elizabeth remained resistant to and had not been cooperative with the Hospital's prescribed treatment, the Hospital re-ferred J.O.B.'s case to the County Tribunal and proposed transferring the right to decide J.O.B.'s care to CWS. The hospital made the referral to the County Tribunal at the end of March 2007. Following a hearing, the County Tribunal entered an order on June 27, 2007, ("County Tribunal's Order"), granting Baerum Municipality the responsibility for the care of J.O.B. pursuant to Norway's Child Welfare Act, placing J.O.B. in the foster care of Harry, and granting Elizabeth weekend visitation every other week.

Even though the order did not require it, Elizabeth testified that CWS demanded that Elizabeth hand over J.O.B.'s American passport in order to exercise her visitation rights. Elizabeth testified that after not seeing J.O.B. for six weeks she relented and surrendered J.O.B.'s American passport. Elizabeth further testified that while the County Tribunal's order did not require her visitation with the children to be supervised, CWS determined it should be supervised for the first several weeks. Elizabeth and her daughters remained in Norway until August 2007. At that time, after obtaining a Swedish passport for J.O.B., Elizabeth and her daughters fled to Texas to live with Elizabeth's sister, who had earlier offered to take them in and assist in obtaining medical care for J.O.B. in the United States.

CWS contacted Harry after it received an anonymous tip that Elizabeth had fled to the United States with her daughters. Several days later, Elizabeth called Harry and told him that they were in Texas. Harry testified that he visited Elizabeth and his daughters in Texas. While there, Harry testified that Elizabeth told him "all the children wanted to go back" to Norway. Additionally, he testified that Elizabeth told him she would return to Norway if she won her appeal of the County Tribu-

nal's Order. Elizabeth lost her appeal and did not return to Norway.

## ISSUES ON APPEAL

In six issues, the Municipality argues on appeal that the trial court erred: (1) by determining that Norway was not the country of J.O.B.'s habitual residence; (2) by denying the return of J.O.B. to Norway pursuant to the Hague Convention; (3) by failing to recognize and enforce the Norwegian Court orders pursuant to section 152.105 of the Texas Family Code; (4) by failing to enforce the Norwegian court orders pursuant to section 152.303 of the Texas Family Code; (5) by failing to follow the principles of comity; and (6) by awarding attorney's fees to appellee. Elizabeth responds that the Municipality failed to preserve its issues and, alternatively, that there is no basis for finding that the implied findings of the trial court are erroneous.

## HAGUE CONVENTION

In 1980, various nations "agreed to the Hague Convention in order to 'protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence.' " *In the Interest of A.V.P.G.,* 251 S.W.3d 117, 122 (Tex.App.-Corpus Christi 2008, no pet.) (quoting Hague Convention, Preamble, 51 Fed. Reg. 10,494 (March 26, 1986)). Both the United States and Norway are signatories to the treaty. *Vaile v. Eighth Judicial Dist. Court,* 118 Nev. 262, 277, 44 P.3d 506, 517 (2002).[6] The United States Congress implemented the Hague Convention in 1988 by enacting ICARA. *Id.* at 277, 44 P.3d at 516 & n. 27. Section 1160(a)(4) of ICARA provides as follows:

The Convention ... establishes legal rights and procedures for the prompt return of children who have been wrongfully removed or retained, as well as for securing the exercise of visitation rights. Children who are wrongfully removed or retained within the meaning of the Convention are to be promptly returned unless one of the narrow exceptions set forth in the Convention applies. The Convention provides a sound treaty framework to help resolve the problem of international abduction and retention of children and will deter such wrongful removals or retentions.

42 U.S.C.A. § 11601(a)(4). The primary aim of the Convention is to " 'restore the pre-abduction status quo and to deter parents from crossing borders in search of a more sympathetic court.' " *England v. England,* 234 F.3d 268, 271 (5th Cir.2000) (quoting *Friedrich v. Friedrich,* 78 F.3d 1060, 1063 (6th Cir.1996)). Under ICARA, courts in the United States are empowered "to determine only rights under the Convention and not the merits of any underlying child custody claims." 42 U.S.C.A. § 11601(b)(4).

Any individual, institution, or other legal body "seeking to initiate judicial proceedings under the Convention for the return of a child ... may do so by commencing a civil action by filing a petition for the relief sought in any court which has jurisdiction of such action and which is authorized to exercise its jurisdiction in the place where the child is located at the time the petition is filed." *Id.* § 11603(b). ICARA establishes specific burdens of proof for the person or institution seeking the return of the child under the Hague Convention, and for the person or institution opposing the return of the child. *Id.* § 11603(e). The

**6.** "The United States ratified the Convention in 1988, and Norway ratified the Convention in 1989." *Vaile,* 118 Nev. at 277, 44 P.3d at 517 n. 30.

petitioner seeking return of the child must establish by a preponderance of the evidence that the child has been wrongfully removed or retained within the meaning of the Convention. *Id.* § 11603(e)(1)(A).

The removal or the retention of a child is to be considered wrongful under the Convention where:

> · [ *(a)* ] it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and [ *(b)* ] at the time of removal or retention those rights were actually being exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

Hague Convention, art. 3.

■ The Hague Convention does not provide an exhaustive list of the rights that constitute "rights of custody." However, the Convention defines "rights of custody" as "rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence" and defines "rights of access" as "the right to take a child for a limited period of time to a place other than the child's habitual residence." Hague Convention, art. 5. Therefore, for purposes of the application of the Convention, "rights of custody" may be interpreted more broadly than those generally associated with the right to physical possession of a child in the United States. *See Furnes v. Reeves,* 362 F.3d 702, 711 (11th Cir.2004).[7]

■ A court analyzing wrongful removal under the Hague Convention must answer four questions:

> (1) When did the removal or retention at issue take place? (2) Immediately prior to the removal or retention in which state was the child habitually resident? (3) Did the removal or retention breach the rights of custody attributed to the petitioner under the law of the habitual residence? (4) Was the petitioner exercising those rights at the time of removal or retention?

*Mozes v. Mozes,* 239 F.3d 1067, 1070 (9th Cir.2001). "Once a petitioner has established that the retention or removal was wrongful and in violation of the petitioner's custodial rights, 'the court *must* order the child's return to the country of habitual residence unless the respondent demonstrates that one of the [Hague Convention's] four narrow exceptions apply.'"[8]

---

7. The *Furnes* court explained as follows:

In American courts, we tend to think of custody rights primarily in the sense of *physical* custody of the child. However, in applying the Hague Convention, we must look to the definition of "rights of custody" set forth in the Convention and not allow our somewhat different American concepts of custody to cloud our application of the Convention's terms. Specifically, in this case we must think of "rights of custody" as including "rights relating to the care of the person of the child," and in particular, "the right to determine the child's place of residence."

*Furnes,* 362 F.3d at 711.

8. There are only a few exceptions to the mandatory return rule. *See* 42 U.S.C.A.

§ 11603(e)(2); *see also* Hague Convention, arts. 12, 13, 20. Certain of these defenses must be established by a preponderance of the evidence while others must be established by clear and convincing evidence. *See* 42 U.S.C.A. § 11603(e)(2). The following defenses must be established by a preponderance of the evidence:

1) the person [or institution] having care of the child was not actually exercising the custody rights at the time of the removal or retention; or

2) the person [or institution] having care of the child acquiesced in the removal or retention of the child[;] or

3) the child objects to being returned and has attained an age and degree of maturity

*In the Interest of A.V.P.G.,* 251 S.W.3d at 123 (quoting *Croll v. Croll,* 229 F.3d 133, 138 (2nd Cir.2000)).

## HABITUAL RESIDENCE

We begin our analysis with the trial court's threshold determination that Norway was not J.O.B.'s habitual residence at the time of her removal to the United States in August 2007, thereby preventing the application of the Hague Convention.

### Standard of Review

■ The question of habitual residence is a mixed question of law and fact. *Flores v. Contreras,* 981 S.W.2d 246, 249 (Tex.App.-San Antonio 1998, pet. denied). "When a matter involving both factual determinations and legal conclusions is decided by the trial court, Texas courts generally employ the abuse of discretion standard." *Id.* In applying that standard, we defer to the trial court's factual determinations if they are supported by the evidence, but review the trial court's legal determinations de novo. *Brainard v. State,* 12 S.W.3d 6, 30 (Tex.1999); *see also Flores,* 981 S.W.2d at 249. We determine first whether the trial court has sufficient evidence upon which to exercise its discretion, and second, whether the trial court erred in its application of that discretion. *Boyd v. Boyd,* 131 S.W.3d 605, 611 (Tex.App.-Fort Worth 2004, no pet.); *see also In re K.E.L.,* No. 09–08–00014–CV, 2008 WL 5671873, at *1–2

(Tex.App.-Beaumont Feb. 26, 2009, no pet.). "The applicable sufficiency review comes into play with regard to the first question." *Boyd,* 131 S.W.3d at 611 (citing *In the Interest of T.D.C.,* 91 S.W.3d 865, 872 (Tex.App.-Fort Worth 2002, pet. denied) (op. on reh'g)).

### Waiver

■ With respect to the trial court's habitual residence determination, the Municipality of Baerum presented the following points of error on appeal:

1. Whether the lower court erred in determining that Norway is not the country of habitual residence of [J.O.B.];

2. Whether the lower court erred in denying the return of [J.O.B.] to Norway.

In response, appellee argues in part that the Municipality "waived all of its issues because Appellant's Brief contains no allegation or argument that any of the findings implied by the judgment violated any standard of review. . . ." Appellee asserts that because the Municipality did not specially articulate a challenge to the sufficiency of the evidence in support of the trial court's judgment, the Municipality has waived any complaint on appeal.

■ Neither party requested findings of fact or conclusions of law. "In a nonjury trial, where no findings of fact or conclusions of law are filed or requested, it is implied that the trial court made all the

---

at which it is appropriate to take account of its views[;] or
4) the proceeding was commenced more than one year after the removal of the child and the child has become "well settled" in his or her new environment; or
5) the person seeking return has consented or subsequently acquiesced in the removal or retention.
*In the Interest of A.V.P.G.,* 251 S.W.3d at 123 (citing Hague Convention, arts. 12, 13); *see also* 42 U.S.C.A. § 11603(e)(2)(B). There are

two other defenses, which must be shown by clear and convincing evidence:
1) that there is a grave risk that the return of the child(ren) would expose it (them) to physical or psychological harm, or
2) that the return of the child would not be permitted by fundamental principles of the requested state relating to the protection of human rights and fundamental freedoms.
*See In the Interest of A.V.P.G.,* 251 S.W.3d at 123–24 (citing Hague Convention, arts. 13b, 20); *see also* 42 U.S.C.A. § 11603(e)(2)(A).

necessary findings to support its judgment." *Roberson v. Robinson,* 768 S.W.2d 280, 281 (Tex.1989). Under such circumstances, the reviewing court must affirm the judgment on any legal theory finding support in the evidence. *See Worford v. Stamper,* 801 S.W.2d 108, 109 (Tex.1990). "When a statement of facts is brought forward, [a trial court's] implied findings may be challenged by factual sufficiency and legal sufficiency points the same as jury findings or a trial court's findings of fact." *Roberson,* 768 S.W.2d at 281.

■ An issue or a point of error notifies not only the court, but the appellee, of errors appellant is specifically complaining about so that the appellee may adequately respond. *See Forrest v. Vital Earth Res.,* 120 S.W.3d 480, 486 (Tex.App.-Texarkana 2003, pet. denied). The Texas Supreme Court has moved away from past rigorous requirements regarding the wording of points of error. *See Pool v. Ford Motor Co.,* 715 S.W.2d 629, 632–33 (Tex.1986) (citing *Holley v. Watts,* 629 S.W.2d 694, 696 (Tex.1982)). In *Holley,* the Court stated:

> The points of error do not specify whether they are directed to complaints of "insufficient evidence," "no evidence," "against the great weight and preponderance of the evidence," or "as a matter of law." It is our practice to liberally construe the points of error in order to obtain a just, fair and equitable adjudication of the rights of litigants. Calvert, "No Evidence" and "Insufficient Evidence" Points of Error, 38 Tex.L.Rev. 361 (1960). We look not only at the wording of the points of error, but to the argument under each point to determine as best we can the intent of the party.

*Holley,* 629 S.W.2d at 696. Courts now hold that "[w]here complained-of error is readily apparent from the argument briefed, an appellate court can consider it." *Forrest,* 120 S.W.3d at 485 (citing *Pool,* 715 S.W.2d at 632–33); *see also Anderson v. Gilbert,* 897 S.W.2d 783, 784 (Tex.1995) (A point of error " 'is sufficient if it directs the attention of the appellate court to the error about which complaint is made.' ") (citing former Tex.R.App. P. 74(d)); *see also Williams v. Khalaf,* 802 S.W.2d 651, 658 (Tex.1990) ("We have a policy of 'permitting broader points of error,' 'liberally construing briefing rules,' and relaxing the 'past rigorous requirements as to the wording of points of error,' in order to do justice."). The Municipality's complaint that the trial court erred in its implied determination that Norway was not the habitual residence of J.O.B., and, therefore, erred in failing to require her return, is apparent from the Municipality's argument, which is based on both the facts and the law. We will address the merits of the Municipality's complaint that the trial court abused its discretion in determining that Norway was not the country of habitual residence of J.O.B. on the date of her removal, thereby preventing the application of the Hague Convention.

### Applicable Law

■ While the Hague Convention does not define "habitual residence," courts have concluded that it "refers to a child's customary residence prior to his or her removal or retention." *In the Interest of J.J.L.-P.,* 256 S.W.3d 363, 372 (Tex.App.-San Antonio 2008, no pet.). The court explained as follows:

> The habitual residence inquiry proceeds on a case-by-case basis, and it focuses not upon a child's domicile or legal residence but where the child physically lived "for an amount of time sufficient for acclimatization and which has a 'degree of settled purpose' from the child's perspective." The determination of whether any particular place satisfies this standard focuses "on the child, not

the parents, and examine[s] past experience, not future intentions."

*Id.* (quoting *Flores,* 981 S.W.2d at 249). While we agree the analysis focuses in part on the child's circumstances in a particular place, the parents' present, shared intentions regarding their child's presence in a particular place are also relevant. *See Feder v. Evans–Feder,* 63 F.3d 217, 224 (3d Cir.1995); *see also Gitter v. Gitter,* 396 F.3d 124, 131–32 (2nd Cir.2005); *Ruiz v. Tenorio,* 392 F.3d 1247, 1252–54 (11th Cir. 2004); *Mozes,* 239 F.3d at 1076; *Van Driessche v. Ohio–Esezeoboh,* 466 F.Supp.2d 828, 842 (S.D.Tex.2006); *Clausier v. Mueller,* No. 4:03–CV–1467–A, 2004 WL 906514, at *1 (N.D.Tex. Apr. 27, 2004).

██ The *Mozes* Court provides perhaps the most comprehensive analysis regarding the habitual residence determination and is instructive on the relevance of parental intent. *See Mozes,* 239 F.3d at 1067. The Court noted that the most straightforward way to determine habitual residence may be to observe one's behavior. *Id.* at 1073. Quoting Lord Scarman, the Court stated, "'[I]n their natural and ordinary meaning the words mean that the

person must be habitually and normally resident [in a particular location] apart from temporary or occasional absences of long or short duration.'" *Id.* (quoting *Shah v. Barnet London Borough Council and other appeals,* [1983] 1 All E.R. 226, 234 (Eng.H.L.)).[9] The Court explained that under such an approach, were the Court to "observe someone centering his life around a particular location during a certain period, so that every time he goes away from it he also comes back, [the Court might] call this his habitual residence." *Id.* at 1073–74. The Court recognized, however, that while such an approach is intuitively appealing, it is also fatally flawed in that it may yield very different results depending on the time frame in which the person is observed. *Id.* at 1074. The Court concluded, therefore, that in determining habitual residence the Court must examine and "pay close attention to" the subjective intent of the child's parents regarding the child's presence in a particular location.[10] *Id.; see also Gitter,* 396 F.3d at 132. Specifically, there must be a settled purpose with respect to a child's presence in a particular place.[11]

---

9. Lord Scarman was reviewing the application of the term "ordinary residence" in a domestic British statute. Lord Scarman's discussion was later adopted in *Re Bates,* No. CA 122/89, High Court of Justice, Fam. Div'l Ct. Royal Courts of Justice, United Kingdom, P. 33 (1989), which became a leading case on habitual residence. *Mozes,* 239 F.3d at 1073 n. 13.

10. Children, particularly those whose return may be ordered under the Convention, normally lack the ability and capacity to decide when and where they will reside. *In re Mozes,* 239 F.3d at 1076. Therefore, in cases where intent is relevant, such as to determine whether absence from a particular location is intended to be only temporary, the intent or purpose to be taken into account is that of the person or persons entitled to fix the place of a child's residence. *Id.; see also Gitter,* 396 F.3d at 132; *Van Driessche,* 466 F.Supp.2d at 842–43 & n. 18.

11. Elaborating on the subjective element of the analysis, the court explained:

> [T]here must be a "settled purpose":
>> The purpose may be one or there may be several. It may be specific or general. All the law requires is that there is [sic] a settled purpose. That is not to say that the propositus intends to stay where he is indefinitely; indeed his purpose, while settled, may be for a limited period. Education, business or profession, employment, health, family or merely love of the place spring to mind as common reasons for a choice of regular abode. And there may well be many others. All that is necessary is that the purpose of living where one does has a sufficient degree of continuity to be properly described as settled.

*Mozes,* 239 F.3d at 1074 (quoting *Shah,* [1983] 1 All E.R. at 235).

*Mozes,* 239 F.3d at 1074. However, while "[b]eing habitually resident in a place must mean that you are, in some sense, 'settled' there ... it need not mean that's where you plan to leave your bones." *Id.*

The *Mozes* court also recognized a distinction between abandoning a prior habitual residence and establishing a new one. *Id.* at 1075. It stated:

[T]he first step toward acquiring a new habitual residence is forming a settled intention to abandon the one left behind. Otherwise, one is not habitually residing; one is away for a temporary absence of long or short duration. Of course, one need not have this settled intention at the moment of departure; it could coalesce during the course of a stay abroad originally intended to be temporary. Nor need the intention be expressly declared, if it is manifest from one's actions; indeed, one's actions may belie any declaration that no abandonment was intended. If you've lived continuously in the same place for several years on end, for example, we would be hard-pressed to conclude that you had not abandoned any prior habitual residence. On the other hand, one may effectively abandon a prior habitual residence without intending to occupy the next one for more than a limited period. Whether there is a settled intention to abandon a prior habitual residence is a question of fact to which we defer to the district court.

*Id.* at 1075–76 (footnotes omitted).

The *Mozes* court cautioned that in the face of uncertain or contrary parental intent, courts should be slow to infer that a prior habitual residence had been abandoned based solely on the child's contacts with a new country. *Mozes,* 239 F.3d at 1078–79. The court stated:

Even if deliberate manipulation were not a danger, divining from a child's ob-

served contacts in a new country whether it has come to reside there habitually would be an enterprise fraught with difficulty. Children can be remarkably adaptable and form intense attachments even in short periods of time—yet this does not necessarily mean that the child expects or intends those relationships to be long-lived. It is quite possible to participate in all the activities of daily life while still retaining awareness that one has another life to go back to. In such instances one may be "acclimatized" in the sense of being well-adjusted in one's present environment, yet not regard that environment as one's habitual residence. It thus makes sense to regard the intentions of the parents as affecting the length of time necessary for a child to become habitually resident, because the child's knowledge of these intentions is likely to color its attitude toward the contacts it is making.

*Id.* at 1079–80.

Nevertheless, the court recognized that habitual residence is a determination based on the factual circumstances of a child's life and it can change even where there are parental intentions to the contrary. *Id.* at 1078, 1080–81. The court explained:

Habitual residence is intended to be a description of a factual state of affairs, and a child *can* lose its habitual attachment to a place even without a parent's consent. Even when there is no settled intent on the part of the parents to abandon the child's prior habitual residence, courts should find a change in habitual residence, if "the objective facts point unequivocally to a person's ordinary or habitual residence being in a particular place." The question in these cases is not simply whether the child's life in the new country shows some minimal "degree of settled purpose," but

whether we can say with confidence that the child's relative attachments to the two countries have changed to the point where requiring return to the original forum would now be tantamount to taking the child "out of the family and social environment in which its life has developed."

*Id.* at 1081 (citations omitted).

 The *Gitter* court agreed that courts should not be quick to conclude that acclimatization to a new environment trumps prior mutual intent for the child to habitually reside elsewhere, but like *Mozes, Gitter* recognized that under relatively rare circumstances a child's contacts with a new country may point unequivocally to the new country as the child's habitual residence regardless of parental intent. *See Gitter*, 396 F.3d at 134. The court stated:

As *Mozes* cautions, however, courts should be "slow to infer" that the child's acclimatization trumps the parents' shared intent. The object of the Convention is to dissuade parents and guardians from engaging in gamesmanship with a child's upbringing in order to secure advantage in an anticipated custody battle. Permitting evidence of acclimatization to trump evidence of earlier parental agreement could "open children to harmful manipulation when one parent seeks to foster residential attachments during what was intended to be a temporary visit."

In relatively rare circumstances, however, it is possible that the child's acclimatization to the location abroad will be so complete that serious harm to the child can be expected to result from compelling his return to the family's intended residence. As noted earlier, a child who has spent fifteen years abroad, for example, would predictably suffer severe harm if returned to the state he had experienced only at birth. In such circumstances the likelihood that the child would be harmed from the deprivation of his acclimatized life in the new residence might overcome the showing that the parents' last shared intent was to return to the original domicile. The child's acclimatization might thus "point unequivocally" to a change in his habitual residence.

*Id.* (citations omitted). Therefore, *Gitter* concluded that in determining a child's habitual residence, a court should apply the following standard:

First, the court should inquire into the shared intent of those entitled to fix the child's residence (usually the parents) at the latest time that their intent was shared. In making this determination the court should look, as always in determining intent, at actions as well as declarations. Normally, the shared intent of the parents should control the habitual residence of the child. Second, the court should inquire whether the evidence unequivocally points to the conclusion that the child has acclimatized to the new location and thus has acquired a new habitual residence, notwithstanding any conflict with the parents' latest shared intent.

*Id.* We apply the standard set forth by *Gitter*.[12]

---

12. We recognize that the San Antonio Court of Appeals has indicated that the habitual residence inquiry should focus on the child and not the parents. *See In the Interest of J.J.L.-P.*, 256 S.W.3d at 372–73; *Flores*, 981 S.W.2d at 249. However, these cases rely on decisions handed down prior to *Mozes* and

*Gitter*. In light of case law authority implementing an analysis that considers the latest shared parental intent, we find it appropriate to do so under the circumstances of this case. Had this framework been employed in *In the Interest of J.J.L.-P.* and *Flores*, we believe the outcome with respect to the habitual resi-

## Analysis

Here, the trial court impliedly found that the latest shared intention of Elizabeth and Harry was to relocate J.O.B. to Maui, Hawaii, in 2002. There is an implied finding that during that time Maui became J.O.B.'s habitual residence, as well as an implied finding that the habitual residence of Maui had not been abandoned at the time of the alleged wrongful removal from Norway in 2007. We must give deference to the trial court's factual determinations if they are supported by the evidence. *Brainard,* 12 S.W.3d at 30.

Based on our review, the record supports a finding that Harry and Elizabeth's latest shared intention was in 2002 when the entire family moved back to Maui, Hawaii. J.O.B. remained in Maui from 2002 until 2005, making Maui her habitual residence. Elizabeth testified that her intentions when she left Maui with the children in June 2005 were simply to visit Harry for the summer and to return to Maui in August 2005. While Harry testified that the family was relocating back to Norway because he could no longer financially sustain them in Maui, there is evidence that Elizabeth had made plans to return to Hawaii with her daughters later in August of that same year.

Elizabeth's testimony supports the trial court's implied finding that Elizabeth intended her departure from Hawaii to be only temporary. Elizabeth had moved her daughters out of their two-story home in Hawaii prior to leaving for Norway in June, but had already found a one-story home to rent upon their return in August. Elizabeth left much of the family's possessions and most of their furniture in storage in Maui. She left her daughters' pets in a kennel in Maui paid in advance through August 2005. She had not closed her furniture store, her bank account, or changed her address. The trial court impliedly found no shared intent as of 2005 to abandon Maui and make Norway J.O.B.'s permanent home

In light of the support the trial court's implied factual findings have in the evidence, the question then becomes whether the evidence unequivocally points to the conclusion that J.O.B. had acclimatized to Norway to the extent that her presence there changed her habitual residence, notwithstanding the prior mutual parental intentions to make Maui her home. *See Gitter,* 396 F.3d at 134; *see also Holder v. Holder,* 392 F.3d 1009, 1019 (9th Cir.2004) ("Having determined that the [parents] did not share a settled intention to adopt Germany as their children's habitual residence, we consider whether the children had acclimatized to life in Germany."); *see also Ruiz,* 392 F.3d at 1255 ("Because the absence of a shared and settled intention by the parents to abandon the previous United States habitual residence of the children is not dispositive, we next look to the relevant objective facts.").

We recognize the relevance of mutual parental intent in determining a child's habitual residence in a case such as this. Nevertheless, the habitual residence determination requires weighing of the factual circumstances of J.O.B.'s life. *See Mozes,* 239 F.3d at 1081. *Mozes* clearly stated that "given enough time and positive experience, a child's life may become so firmly embedded in [a] new country as to make it habitually resident even though there be lingering parental intentions to the contrary." *Id.* at 1078. The implied finding

---

dence determinations in those cases would have been the same. In a case such as this, where the child in question has been moved about for much of her life, at times living with one parent and at times with both, we find an analysis that takes into account the latest shared parental intent regarding her habitual residence necessary and appropriate.

that Harry and Elizabeth last shared an intention to make Maui J.O.B.'s home in 2002 is not wholly dispositive.

J.O.B. lived in Norway for two years following her return to that country in 2005. During that time she attended school, spent time with both of her parents, and received treatment for her JRA. The Hague Convention thus required the trial court to determine, based on the objective facts, not whether J.O.B.'s life in Norway between 2005 and 2007 showed "some minimal 'degree of settled purpose,'" but rather, whether the court could say "with confidence" that J.O.B.'s relative attachments to the two countries changed to the extent that returning J.O.B. to Norway would be tantamount to sending her home. *See Mozes*, 239 F.3d at 1081; *see Holder*, 392 F.3d at 1019. Here, the trial court must have determined that it could not say with confidence that returning J.O.B. to Norway would be tantamount to sending her home. Based on the evidence before it, the trial court impliedly found that the habitual residence of Maui had not been abandoned, and that the objective facts did not point unequivocally to Norway as being J.O.B.'s habitual residence in August 2007. While there is conflicting evidence of an unsettled lifestyle as between the United States and Norway, we do not find the evidence of J.O.B.'s acclimatization to the country of Norway to be so overwhelming as to render the trial court's findings to the contrary erroneous.

The trial court could reasonably conclude that what began as a vacation for J.O.B. in 2005 turned into a temporary, but long absence from her home in the United States. While J.O.B. was in Norway between 2005 and 2007, her parents formally separated and then divorced. During that time J.O.B. lived with her mother and sisters in a small, sparsely furnished apartment. J.O.B.'s mother received government assistance in Norway. J.O.B. attended counseling to deal with issues relating to her parents' relationship. The dispute over proper treatment for J.O.B.'s illness continued between her mother, and to some extent her father, and the doctors in Norway from 2005 until 2007. Finally in 2007, prior to her return to the United States, J.O.B. was placed in the temporary foster care of her father. J.O.B. remained physically present in Norway from 2005 until 2007, but the trial court could reasonably conclude that her life there was unstable and unsettled.

In addition, Elizabeth testified that while living in Norway, J.O.B. believed her presence there was temporary, and that "it was just a matter of time" before she would return to the United States with her mother and sisters. J.O.B. told the trial court that her trip to Norway in 2005 was intended to be temporary and that she thought they would return to Maui in six months. J.O.B. told the trial court, "I didn't feel like I was going to Norway to make a home because I felt I was going to exercise and try to start walking and then go back to Maui because that's my home. It was just kind of like a long vacation in Norway." J.O.B. maintained a strong connection to Maui while she was in Norway. J.O.B. told the trial court she kept in touch with her friends in Maui through email, as they also expected her to return in six months.

J.O.B. returned to Maui with her mother and sister for an extended visit between November 2006 and February 2007, during which time they stayed with friends in Maui. The record established that while back in Maui, J.O.B. was seen by doctors at Shriners Hospitals for Children in Honolulu. J.O.B. made it clear to the trial court that Maui was her home and that she did not think of Norway as home. J.O.B. also expressed her desire to receive treat-

ment for her illness in the United States. J.O.B. told the trial court that she trusted the doctors in the United States more because they "listen to you more."

On the record before us, we find sufficient evidence exists in the record to support the trial court's findings that J.O.B.'s habitual residence in the United States had not been abandoned. We hold the trial court did not abuse its discretion. We overrule issue one. Because the trial court's implied habitual residence finding prevents the application of the Hague Convention, we overrule issue two.

## UNIFORM CHILD CUSTODY JURISDICTION AND ENFORCEMENT ACT

In issues three and four, the Municipality asserted the following pursuant to the Uniform Child Custody Jurisdiction and Enforcement Act:

3. Whether the lower court erred by failing to recognize and enforce the Norwegian Court Orders ... pursuant to Texas Family Code Section 152.105 of the Uniform Child Custody Jurisdiction and Enforcement Act.

4. Whether under Texas Family Code Section 152.303 of the Uniform Child Custody Jurisdiction and Enforcement Act the lower court had a duty to enforce the Norwegian Court orders and whether the lower court erred in not enforcing the Norwegian Court orders.

Specifically, the Municipality argues that because its petition under the Hague Convention requested that a writ of attachment be issued for the return of J.O.B., the lower court erred under sections 152.105 and 152.303 of the Texas Family Code "by failing to immediately attach the child and order her return to Norway, pursuant to the Norwegian Court orders dated June 27, 2007 and January 9, 2008."

The County Tribunal's Order was entered into evidence at the trial court's hearing on the Municipality's petition under the Hague Convention. The Norway District Court judgment, dated January 9, 2008, denying Elizabeth's appeal and affirming the County Tribunal's order was attached to the Municipality's petition. The County Tribunal found that J.O.B. would not receive proper treatment while in the care of her mother, and that care and responsibility for J.O.B. should be transferred to CWS. The Norway District Court judgment reflects and reiterates the County Tribunal's original conclusions:

1. Baerum municipality shall take over the care and responsibility for [J.O.B.] ... pursuant to the Child Welfare Act § 4-12, 1.

2. [J.O.B.] is placed in a foster home with her father ... pursuant to the Child Welfare Act § 4-14, with ref. to § 4-15.

3. [J.O.B.] shall have social contact with her mother one weekend from Friday to Sunday, every second week.

### Applicable Law

Section 152.105 of the Texas Family Code provides as follows:

(a) A court of this state shall treat a foreign country as if it were a state of the United States for the purpose of applying this subchapter and Subchapter C.

(b) Except as otherwise provided in Subsection (c), a child custody determination made in a foreign country under factual circumstances in substantial conformity with the jurisdictional standards of this chapter must be recognized and enforced under Subchapter D.

(c) A court of this state need not apply this chapter if the child custody law of a foreign country violates fundamental principles of human rights.

TEX. FAM.CODE ANN. § 152.105(a)-(c) (Vernon 2008). Subchapter C establishes jurisdiction of Texas Courts to make child custody determinations. *Id.* § 152.201–.210. Among other things, Subchapter C sets forth the jurisdictional standards for a Texas court to make an initial child custody determination, maintain exclusive continuing jurisdiction over a child custody determination, modify a child custody determination, and exercise temporary emergency jurisdiction to make or modify a child custody determination. *Id.* §§ 152.201–.204. Subchapter D deals with enforcement of child custody determinations. *Id.* §§ 152.301–.317.

Section 152.303 of the Family Code addresses a Texas court's duty to enforce a child custody determination of another state. It provides:

> (a) A court of this state shall recognize and enforce a child custody determination of a court of another state if the latter court exercised jurisdiction in substantial conformity with this chapter or the determination was made under factual circumstances meeting the jurisdictional standards of this chapter and the determination has not been modified in accordance with this chapter.

> (b) A court of this state may utilize any remedy available under other law of this state to enforce a child custody determination made by a court of another state. The remedies provided in this subchapter are cumulative and do not affect the availability of other remedies to enforce a child custody determination.

*Id.* § 152.303. Moreover, a Texas court "may grant any relief normally available under the law of this state to enforce a registered child custody determination made by a court of another state." *Id.* § 152.306(a). Section 152.305 sets out the procedure by which a child custody determination of another state may be regis-

tered in Texas. *Id.* § 152.305. However, the registration procedure under section 152.305 is not mandatory for enforcement of a foreign custody determination. *See id.* §§ 152.303, 152.305, 152.308–.310. The registration procedure can be used to predetermine the enforceability of a custody determination. *See* John J. Sampson & Harry L. Tindall, *Texas Family Code Annotated* § 152.305, Commissioner's Comment (West 2008).

A petition may generally be filed for enforcement of a child custody determination, irrespective of whether the judgment is registered in Texas. *See* TEX. FAM.CODE ANN. §§ 152.308–.309. Section 152.308 sets forth the procedural requirements for filing such a petition. The petition must be verified; certified copies of all orders sought to be enforced and of any order confirming registration must be attached to the petition; and a copy of a certified copy of an order may be attached instead of the original. *Id.* § 152.308(a). Further, the petition must state:

> (1) whether the court that issued the determination identified the jurisdictional basis it relied upon in exercising jurisdiction and, if so, what the basis was;

> (2) whether the determination for which enforcement is sought has been vacated, stayed, or modified by a court whose decision must be enforced under this chapter and, if so, identify the court, the case number, and the nature of the proceeding;

> (3) whether any proceeding has been commenced that could affect the current proceeding, including proceedings relating to domestic violence, protective orders, termination of parental rights, and adoptions, and, if so, identify the court, the case number, and the nature of the proceeding;

> (4) the present physical address of the child and the respondent, if known;

(5) whether relief in addition to the immediate physical custody of the child and attorney's fees is sought, including a request for assistance from law enforcement officials and, if so, the relief sought; and

(6) if the child custody determination has been registered and confirmed under Section 152.305, the date and place of registration.

TEX. FAM.CODE ANN. § 152.308(b)(1)-(6).

Section 152.308 also contains the following provisions regarding notice:

(c) Upon the filing of a petition, the court shall issue an order directing the respondent to appear in person with or without the child at a hearing and may enter any order necessary to ensure the safety of the parties and the child. The hearing must be held on the next judicial day after service of the order unless that date is impossible. In that event, the court shall hold the hearing on the first judicial day possible. The court may extend the date of hearing at the request of the petitioner.

(d) An order issued under Subsection (c) must state the time and place of the hearing and advise the respondent that at the hearing the court will award the petitioner immediate physical custody of the child and order the payment of fees, costs, and expenses under Section 152.312, and may schedule a hearing to determine whether further relief is ap-

propriate, unless the respondent appears and establishes that:

(1) the child custody determination has not been registered and confirmed under Section 152.305 and that:

(A) the issuing court did not have jurisdiction under Subchapter C;

(B) the child custody determination for which enforcement is sought has been vacated, stayed, or modified by a court having jurisdiction to do so under Subchapter C; or

(C) the respondent was entitled to notice, but notice was not given in accordance with the standards of Section 152.108, in the proceedings before the court that issued the order for which enforcement is sought; or

(2) the child custody determination for which enforcement is sought was registered and confirmed under Section 152.305, but has been vacated, stayed, or modified by a court of a state having jurisdiction to do so under Subchapter C.

*Id.* § 152.308(c)-(d).

The Request for Writ of Attachment filed by the Municipality was verified and it also provided the statements required under section 152.308(b)(2)-(5).[13] *Id.* § 152.308(b)(2)-(5).

---

13. The Request for Writ stated that the determination for which enforcement was sought had not been vacated, stayed, or modified by a court whose decision must be enforced under chapter 152 of the Texas Family Code. The Request stated that no proceeding had been commenced that could affect the current proceeding. The Request further stated the present physical address of J.O.B. and the respondent. Finally, the Request stated the relief sought in addition to the immediate physical custody of the child, including specif-

ically a request for assistance from law enforcement officials to be authorized to enter private property to take immediate possession of J.O.B. and to provide for the placement of J.O.B. with an appropriate person or entity pending final relief. The Municipality further requested that the Court impose any necessary conditions on the placement of J.O.B. to ensure the appearance of J.O.B. and Elizabeth. *See* TEX FAM CODE ANN. § 152.308(b)(2)-(5).

## Analysis

 As a general rule, a judgment or order rendered by a foreign court may not be enforced in Texas without either filing a common law action to enforce the judgment, or by authenticating the foreign judgment in accordance with the requirements of "an act of congress or an applicable Texas statute." *See In the Interest of Chapman,* 973 S.W.2d 346, 347 (Tex.App.-Amarillo 1998, no pet.). To the extent the Municipality's Request for Writ of Attachment was intended to act as a motion for enforcement of the foreign custody determination, it appears to have complied with some of the procedural requirements set out in section 152.308 of the Family Code, but not others.

Specifically, the Municipality did not attach to its petition or the Request for Writ of Attachment, certified copies of the County Tribunal's Order and the Norway District Court's judgment. *See* Tex. Fam.Code Ann. § 152.308(a). An uncertified copy of the Norway District Court's judgment affirming the County Tribunal's Order was attached to the Municipality's petition under the Hague Convention, together with an affidavit from an attorney with CWS verifying that custody of J.O.B. was transferred to the Municipality and that the County Tribunal's Order was subsequently affirmed in the District Court's judgment. However, there was no certified copy, or a copy of a certified copy of the judgment attached to the petition or to the request for writ of attachment. *See id.* Further, neither the County Tribunal's Order nor the Norway District Court's judgment were registered under section 152.305 of the Family Code. *See id.* § 152.305.

The trial court issued an order in compliance with section 152.308(c)-(d) after receiving the pleadings filed by the Municipality.[14] However, the Municipality did not seek or pursue a ruling regarding enforcement of the foreign custody determination in this state. *See id.* §§ 152.303, 152.308, 152.310; *see also* Tex.R.App. P. 33.1 (As a prerequisite to presenting a complaint for appellate review, the record must show that the complaint was first submitted to and ruled upon by the trial court.). The record does not establish that the Montgomery County trial court specifically considered the request and arguments the Municipality now makes to this court. Therefore, the Municipality failed to preserve issues three and four for our review. Issues three and four are overruled.

Likewise, the Municipality raises the issue of comity for the first time on appeal. The Municipality argues that the trial court erred by "not following the principles of 'comity' and failing to recognize and enforce the Norway Court Order of June 27, 2007. . . ." In the underlying proceedings, the Municipality sought the return of J.O.B. to Norway pursuant to the terms of the Hague Convention. The Municipality did not ask the trial court to enforce the County Tribunal's Order on grounds of comity. *See* Tex.R.App. P. 33.1. We overrule issue five.

## ATTORNEY'S FEES

 In issue six, the Municipality argues that the trial court erred in awarding attorney's fees to Elizabeth because "[a] State Court cannot impose a judgment against a foreign government." The Municipality argues that a foreign govern-

---

14. Upon receiving the Municipality's Petition under the Hague Convention and Request for Writ of Attachment, the trial court issued an order entitled "Notice of Petition under Hague Convention," which complied with section 152.308 of the Family Code. *See* Tex. Fam.Code Ann. § 152.308(c)-(d).

ment is protected by the sovereign immunity doctrine. However, as we have previously stated,

Whether the doctrine of governmental immunity is involved or not, a fundamental rule of Texas jurisprudence governs the award of attorney's fees: they may not be awarded unless prescribed by statute for the particular kind of case or by an agreement between the parties.

*Base–Seal, Inc. v. Jefferson County,* 901 S.W.2d 783, 787 (Tex.App.-Beaumont 1995, writ denied) (quoting *Tex. Employment Comm'n v. Camarena,* 710 S.W.2d 665, 670 (Tex.App.-Austin 1986), *aff'd in part, rev'd in part,* 754 S.W.2d 149 (Tex.1988)). "[T]he defense of sovereign immunity is not required to prevent an award of attorney's fees" where there is no statutory basis for recovery of attorney's fees. *Id.* at 788.

Appellee points to section 11607 of the United States Code to provide a statutory basis for an award of attorney's fees against the Municipality in favor of appellee. *See* 42 U.S.C.A. § 11607(b)(2) (West 2005). Section 11607(b) states as follows:

(b) Costs incurred in civil actions

(1) Petitioners may be required to bear the costs of legal counsel or advisors, court costs incurred in connection with their petitions, and travel costs for the return of the child involved and any accompanying persons, except as provided in paragraphs (2) and (3).

(2) Subject to paragraph (3), legal fees or court costs incurred in connection with an action brought under section 11603 of this title shall be borne by the petitioner unless they are covered by payments from Federal, State, or local legal assistance or other programs.

(3) Any court ordering the return of a child pursuant to an action brought under section 11603 of this title shall order the respondent to pay necessary expenses incurred by or on behalf of the petitioner, including court costs, legal fees, foster home or other care during the course of proceedings in the action, and transportation costs related to the return of the child, unless the respondent establishes that such order would be clearly inappropriate.

*Id.* § 11607(b). Appellee argues the trial court impliedly found that an award of attorney's fees in favor of appellee was appropriate pursuant to section 11607. While the statute clearly mandates an award of attorney's fees and necessary expenses incurred by or on behalf of a successful petitioner pursuant to section 11607(b)(3), a plain reading of the statute does not provide for an award of attorney's fees against an unsuccessful petitioner. Appellee cites no case law authorizing an award under the statute against the Municipality and appellee cites no other statutory authority to support such award. We, therefore, reverse the trial court's award of attorney's fees to appellee. Issue six is sustained.

We affirm the judgment of the trial court in all respects save and except the award of attorney's fees to appellee. We reverse that portion of the trial court's judgment awarding Elizabeth attorney's fees and render judgment that Elizabeth take and recover no attorney's fees against the Municipality.

AFFIRMED IN PART; REVERSED AND RENDERED IN PART.[15]

---

15. We deny appellee's Motion to Strike Improper Argument and Improper Allegations of

Fact and for Sanctions. Our decision is based on our own review of the record and applicable legal principles.